**Arnold S. WELLMAN, Plaintiff,**

v.

**Fairleigh S. DICKINSON, et al., Defendants.**

**Mordecai ROSENFELD, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

**JAY–GRO FABRICS, INC. PENSION TRUST, Plaintiff,**

v.

**SUN COMPANY, INC., et al., Defendants.**

---

BECTON, DICKINSON AND COMPANY, et al., Plaintiffs,

v.

SUN COMPANY, INC., et al., Defendants.

Morton PUPKO, Plaintiff,

v.

Fairleigh S. DICKINSON, Jr., et al., Defendants.

SECURITIES AND EXCHANGE COMMISSION, Plaintiff,

v.

SUN COMPANY, INC., et al., Defendants.

Rubin POLNE, Plaintiff,

v.

SUN COMPANY, INC., et al., Defendants.

Nos. 78 Civ. 284, 78 Civ. 291, 78 Civ. 345, 78 Civ. 539, 78 Civ. 1025, 78 Civ. 1055 and 78 Civ. 1156 (RLC).

United States District Court, S. D. New York.

July 9, 1979.

Securities and Exchange Commission, Washington, D.C. (Theodore Sonde, Charles L. Lerner, Robert B. Blackburn, Robert M. Romano, Washington, D.C., of counsel), for the Securities and Exchange Commission.

Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Arthur Liman, Robert S. Smith, Jack Hassid, Susan P. Carr, Colleen McMahon, Paul B. Kertman, New York City, of counsel), for Becton, Dickinson & Co.

Parker, Auspitz, Neesemann & Delehanty, New York City (Jack C. Auspitz, Bar-

rington D. Parker, Jr., New York City, of counsel), for other plaintiffs.

Kreindler & Kreindler, New York City (Paul Bernstein, Edward A. Grossmann, New York City, of counsel), for Jay-Gro Fabrics, Inc. Pension Trust and Lead Counsel for class plaintiffs.

Kaye, Scholer, Fierman, Hays & Handler, New York City, Wachtell, Lipton, Rosen & Katz, New York City (Peter M. Fishbein, Jay G. Strum, Vincent J. Syracuse, Harvey Belkin, Barry Willner, Jay Wishingrad, Douglas S. Liebhafsky, Peter C. Hein, New York City, of counsel), for Sun Co., Inc.

Orans, Elsen, Polstein & Naftalis, New York City (Sheldon H. Elsen, Leslie A. Lupert, Robert Polstein, Paul Summit, New York City, of counsel), for Fairleigh S. Dickinson and Ann Turner Dickinson.

Cleary, Gottlieb, Steen & Hamilton, New York City (Edmund H. Kerr, Judith Ripps, Steven E. M. Hartz, New York City, of counsel), for Salomon Bros., F. Eberstadt & Co.

Sullivan & Cromwell, New York City (Marvin Schwartz, Michael Barron, New York City, of counsel), for Chemical Fund, Inc., Surveyor Fund Inc.

## OPINION

ROBERT L. CARTER, District Judge.

### I

*Status of the Proceedings*

This litigation stems from the acquisition by Sun Company, Inc. ("Sun"), a Pennsylvania corporation whose principal business is oil and gas, of roughly 34% of the stock of Becton, Dickinson & Company ("BD"), a New Jersey corporation which manufactures health care products and medical testing and research equipment. Sun's brilliantly designed, lightning strike took place in January, 1978, and gave rise to seven separate actions which were consolidated for trial. In 78 Civ. 1055, the Securities and Exchange Commission ("Commission") brings an enforcement action against Sun, L.H.I.W., Inc. (an acronym for *Lets Hope It Works*), the corporation Sun formed to receive the BD shares; Salomon Brothers ("Salomon"), a New York limited partnership engaged in the investment banking and brokerage business; F. Eberstadt & Co., Inc., ("Eberstadt"), a Delaware corporation engaged in investment banking, institutional stock brokerage and the management of pension funds and advisory accounts and which, along with Salomon, handled the Sun acquisition; F. Eberstadt & Co. Managers & Distributors, Inc. ("M & D"), a Delaware company 75% owned by Eberstadt and 25% owned by the estate of Ferdinand Eberstadt,[1] which manages the two Eberstadt mutual funds involved in this proceeding; Robert Zeller, chief executive officer of Eberstadt and vice chairman of M & D; Fairleigh S. Dickinson, Jr., former chairman of BD and one of its principal stockholders; J.H. Fitzgerald Dunning, a former director and large stockholder in BD; and Kenneth Lipper, a partner in Salomon. The Commission charges the defendants with violating or aiding and abetting the violation of Sections 10(b), 13(d), 14(d) and 14(e) of the Securities Exchange Act of 1934, as amended (15 U.S.C. §§ 78j(b),[2] 78m(d),[3] 78n(d)[4] and 78n(e)[5]); Rules 10b–5

---

**1.** Sometime after the events which concern us, M & D became a wholly-owned Eberstadt company.

**2.** 15 U.S.C. § 78j(b) provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors."

**3.** 15 U.S.C. § 78m(d) provides:

"(1) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered

---

**4.** See note 4 on page 791.

**5.** See note 5 on page 792.

except for the exemption contained in section 78*l* (g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors—

(A) the background, and identity, residence, and citizenship of, and the nature of such beneficial ownership by, such person and all other persons by whom or on whose behalf the purchases have been or are to be effected;

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto, except that where a source of funds is a loan made in the ordinary course of business by a bank, as defined in section 78c(a)(6) of this title, if the person filing such statement so requests, the name of the bank shall not be made available to the public;

(C) if the purpose of the purchases or prospective purchases is to acquire control of the business of the issuer of the securities, any plans or proposals which such persons may have to liquidate such issuer, to sell its assets to or merge it with any other persons, or to make any other major change in its business or corporate structure;

(D) the number of shares of such security which are beneficially owned, and the number of shares concerning which there is a right to acquire, directly or indirectly, by (i) such person, and (ii) by each associate of such person, giving the background, identity, residence, and citizenship of each such associate; and

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

. . . . .

(2) If any material change occurs in the facts set forth in the statements to the issuer and the exchange, and in the statement filed with the Commission, an amendment shall be transmitted to the issuer and the exchange and shall be filed with the Commission, in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(3) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for the purposes of this subsection.

(4) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

(5) The Commission, by rule or regulation or by order, may permit any person to file in lieu of the statement required by paragraph (1) of this subsection or the rules and regulations thereunder, a notice stating the name of such person, the number of shares of any equity securities subject to paragraph (1) which are owned by him, the date of their acquisition and such other information as the Commission may specify, if it appears to the Commission that such securities were acquired by such person in the ordinary course of his business and were not acquired for the purpose of and do not have the effect of changing or influencing the control of the issuer nor in connection with or as a participant in any transaction having such purpose or effect.

(6) The provisions of this subsection shall not apply to—

(A) any acquisition or offer to acquire securities made or proposed to be made by means of a registration statement under the Securities Act of 1933;

(B) any acquisition of the beneficial ownership of a security which, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, does not exceed 2 per centum of that class;

(C) any acquisition of an equity security by the issuer of such security;

(D) any acquisition or proposed acquisition of a security which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection."

4. 15 U.S.C. § 78n(d) provides:

"(1) It shall be unlawful for any person, directly or indirectly, by use of the mails or by

any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

(2) When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of this subsection.

(3) In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

(4) Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(5) Securities deposited pursuant to a tender offer or request or invitation for tenders may be withdrawn by or on behalf of the depositor at any time until the expiration of seven days after the time definitive copies of the offer or request or invitation are first published or sent or given to security holders, and at any time after sixty days from the date of the original tender offer or request or invitation, except as the Commission may otherwise prescribe by rules, regulations, or order as necessary or appropriate in the public interest or for the protection of investors.

(6) Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders.

(7) Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

(8) The provisions of this subsection shall not apply to any offer for, or request or invitation for tenders of, any security—

(A) if the acquisition of such security, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, would not exceed 2 per centum of that class;

(B) by the issuer of such security; or

(C) which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection."

5. 15 U.S.C. § 78n(e) provides:

"It shall be unlawful for any person to make any untrue statement of a material fact or omit

(17 C.F.R. § 240.10b–5) [6] and 10b–13 (17 C.F.R. §§ 240.13d–1 and 13d–2),[7] and Regulation 14D (17 C.F.R. § 240.14d–1 [8] and § 240.14d–101 [9]), promulgated thereunder;

to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.''

**6.** 17 C.F.R. § 240.10b–5 provides:

"It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.''

**7.** 17 C.F.R. § 240.13d–1 provides:

"(a) Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to Section 12 of the Act, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in Section 12(g)(2)(G) of the Act, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, is directly or indirectly the beneficial owner of more than five percent of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing the information required by Schedule 13D (§ 240.13d–101). Eight copies of the statement, including all exhibits, shall be filed with the Commission. At the time of filing the statement, the person making the filing shall pay to the Commission a fee of $100, no part of which shall be refunded. For the purposes of section 13(d), any person, in determining the amount of outstanding shares of a class of equity securities, may rely upon information set forth in the issuer's most recent quarterly or annual report, and any current report subsequent thereto, filed with the Commission pursuant to this Act, unless he knows or has reason to believe that the information contained therein is inaccurate.

(b) Whenever two or more persons are required to file a statement pursuant to section 13(d) with respect to the same securities, only one acquisition statement need be filed, *Provided,* That:

(1) Each person on whose behalf the acquisition statement is filed is responsible for the timely filing of such statement and any amendments thereto, and for the completeness and accuracy of the information contained therein; and

(2) Such acquisition statement shall identify all such persons, shall contain the required information with regard to each such person, shall indicate that such statement is filed on behalf of all such persons, and shall include, as an exhibit, their agreement in writing that such a statement is filed on behalf of each of them.'' 17 C.F.R. § 240.13d–2 provides:

"If any material change occurs in the facts set forth in the statement required by § 240.13d–1 (Rule 13d–1), the person or persons who were required to file such statement shall promptly file or cause to be filed with the Commission and send or cause to be sent to the issuer and to each exchange on which the security is traded an amendment disclosing such change. Eight copies of each such amendment shall be filed with the Commission. No additional filing fee shall be required for any such amendment.''

**8.** 17 C.F.R. § 240.14d–1 provides:

"(a) No person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, shall make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 12 of the Act, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 12(g)(2)(G) of the Act, or any equity security issued by the closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 percentum of such Class, unless, at the time copies of the offer or request or invitation are first published or sent or given to security holders, such person has filed with the Commission a statement containing the information and exhibits required by Schedule 14D–1.

**9.** See note 9 on page 794.

(b) If any material change occurs in the facts set forth in the statement required by paragraph (a) of this section, the person who filed such statement shall promptly file with the Commission an amendment disclosing such change.

(c) All tender offers for, or requests or invitations for tenders of, securities published or sent or given to the holders of such securities shall include the following information:

(1) The name of the person making the tender offer, request or invitation;

(2) The exact dates prior to which, and after which, security holders who deposit their securities will have the right to withdraw their securities pursuant to section 14(d)(5) of the Act, or otherwise;

(3) If the tender offer or request or invitation for tenders is for less than all of the outstanding securities of the class and the person making the offer, request or invitation is not obligated to purchase all of the securities tendered, the date of expiration of the period during which the securities will be taken up pro rata pursuant to section 14(d)(6) [of the Act], or otherwise; and

(4) The information required by Items 1(c), 2(b), 2(e), 2(f) and 2(g); 3, 4, 5, 6, 7, 8, 9 and 10 of Schedule 14D-1 (§ 240.14d-100), or a fair and adequate summary thereof.

*Instructions.* 1. Negative responses to any such item or sub-item of Schedule 14D-1 (§ 240.14d-100) need not be included in the information published or sent or given to security holders.

2. Although the financial statements necessary to present a fair and adequate summary of Item 9 of Schedule 14D-1 (§ 240.14d-100) may vary depending on the facts and circumstances involved, summary financial information equivalent to that required by paragraph e of Guide 59 of the Guides of Preparation and Filing of Registration Statements will normally be sufficient summary disclosure of Item 9 for purposes of paragraph (c)(4) of this section. If the information required by Item 9 is summarized, appropriate instructions should be included stating how more complete financial information can be obtained.

(d) Any additional material soliciting or requesting such tender offer subsequent to the initial solicitation or request shall contain the name of the persons making such solicitation or request and the information required by Items 1(c), 2(b), 2(e), 2(f) and 2(g); 3, 4, 5, 6, 7, 8, 9 and 10 of Schedule 14D-1 (§ 240.14d-100), or a fair and adequate summary thereof: *Provided, however,* That such material may omit any of such information previously furnished to the persons solicited or requested for tender offers. Copies of such additional material soliciting or requesting such tender offers shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders.

(e) Ten copies of the statement required by paragraph (a), every amendment to such statement, and all other material required by this rule and such statement shall be filed with the Commission.

(f) If any securities to be offered in connection with the tender offer for, or request or invitation for tenders of, securities with respect to which a statement is required to be filed pursuant to paragraph (a) of this section have been or are to be registered under the Securities Act of 1933, a copy of the prospectus containing the information required to be included therein by § 240.434b of this chapter shall be filed as an exhibit to the statement required by paragraph (a) of this section. Any information contained in such prospectus may be incorporated by reference in such statement.

(g) The definition of beneficial owner set forth in Rule 13d-3 (§ 240.13d-3) for purposes of section 13(d)(1) of the Act shall apply also for purposes of section 14(d)(1) of the Act."

9. 17 C.F.R. § 240.14d-101 sets forth in pertinent part the following filing schedule:

*Item 1. Security and Issuer.*

(a) State the title of the class of equity securities to which this statement relates and the name and address of the issuer of such securities.

(b) Identify the tender offer or request or invitation for tenders to which this statement relates and state the reasons for the solicitation or recommendation to security holders to accept or reject such tender offer, request, or invitation for tenders.

*Item 2. Identity and Background.*

(a) State the name and business address of the person filing this statement.

(b) Describe any arrangement or understanding in regard to the solicitation with (i) the issuer or the management of the issuer or (ii) the maker of the tender offer or request or invitation for tender of securities of the class to which this statement relates.

*Item 3. Persons Retained, Employed, or To Be Compensated.*

Identify any person or class or persons employed, retained or to be compensated, by the person filing this Schedule 14D, or by any person on his behalf, to make solicitations or recommendations to security holders and describe briefly the terms of such employment, retainer or arrangement for compensation.

*Item 4. Material To Be Filed as Exhibits.*

Copies of all solicitations or recommendations to accept or to reject a tender offer or request or invitation for tenders of the securities specified in Item 1 shall be filed as an exhibit.

Sections 17(d) and 17(e) of the Investment Company Act of 1940, as amended (15 U.S.C. §§ 80a–17(d),[10] 80a–17(e)[11]); and Rule 17d–1 (17 C.F.R. § 270.17d–1),[12] promulgated thereunder.

In 78 Civ. 539, BD, its officers and several of its shareholders individually and derivatively sue Sun, L.H.I.W., Dickinson, Dunning, Salomon, Eberstadt, Chemical Fund, Inc., and Surveyor Fund, Inc., alleging violations of the Exchange Act similar to those charged in the Commission's case, and in addition, charging Dickinson and Dunning with violations of their fiduciary obligation to BD and its shareholders. The Chemical and Surveyor Funds are open end invest-

ment companies managed by M & D and registered with the Commission under the Investment Company Act of 1940.

78 Civ. 284, 78 Civ. 291, 78 Civ. 345, 78 Civ. 1025 and 78 Civ. 1156 are class actions against various combinations of the defendants in the Commission's and BD cases and Ann Dickinson Turner, a daughter of Dickinson and a substantial shareholder of BD stock. The class actions allege violations of Sections 10(b), 13(d), 14(d) and 14(e) of the Exchange Act, Sections 2(*l*)(1) and 9(b) of the New Jersey Corporation Takeover Bid Disclosure Law, New Jersey Laws of 1977, Chapter 76,[13] and Rule 390[14] of the New York Stock Exchange ("NYSE"). The class

**10.** 15 U.S.C. § 80a—17(d) provides:

"It shall be unlawful for any affiliated person of or principal underwriter for a registered investment company (other than a company of the character described in section 80a—12(d)(3)(A) and (B) of this title), or any affiliated person of such a person or principal underwriter, acting as principal to effect any transaction in which such registered company, or a company controlled by such registered company, is a joint or a joint and several participant with such person, principal underwriter, or affiliated person, in contravention of such rules and regulations as the Commission may prescribe for the purpose of limiting or preventing participation by such registered or controlled company on a basis different from or less advantageous than that of such other participant. Nothing contained in this subsection shall be deemed to preclude any affiliated person from acting as manager of any underwriting syndicate or other group in which such registered or controlled company is a participant and receiving compensation therefor."

**11.** 15 U.S.C. § 80a–17(e) provides:

"It shall be unlawful for any affiliated person of a registered investment company, or any affiliated person of such person—

(1) acting as agent, to accept from any source any compensation (other than a regular salary or wages from such registered company) for the purchase or sale of any property to or for such registered company or any controlled company thereof, except in the course of such person's business as an underwriter or broker; or

(2) acting as broker, in connection with the sale of securities to or by such registered company or any controlled company thereof, to receive from any source a commission, fee, or other remuneration for effecting such transaction which exceeds (A) the usual and customary broker's commission if the sale is effected on a securities exchange, or (B) 2 per centum of the sales price if the sale is effect-

ed in connection with a secondary distribution of such securities, or (C) 1 per centum of the purchase or sale price of such securities if the sale is otherwise effected unless the Commission shall, by rules and regulations or order in the public interest and consistent with the protection of investors, permit a larger commission."

**12.** 17 C.F.R. § 270.17d–1 provides in pertinent part:

"(a) No affiliated person of or principal underwriter for any registered investment company (other than a company of the character described in section 12(d)(3)(A) and (B) of the act) and no affiliated person of such a person or principal underwriter, acting as principal, shall participate in, or effect any transaction in connection with, any joint enterprise or other joint arrangement or profit-sharing plan in which any such registered company, or a company controlled by such registered company, is a participant, and which is entered into, adopted or modified subsequent to the effective date of this rule, unless an application regarding such joint enterprise, arrangement or profit-sharing plan has been filed with the Commission and has been granted by an order entered prior to the submission of such plan or modification to security holders for approval, or prior to such adoption or modification if not so submitted, except that the provisions of this rule shall not preclude any affiliated person from acting as manager of any underwriting syndicate or other group in which such registered or controlled company is a participant and receiving compensation therefor."

**13.** The pertinent sections of the New Jersey Corporation Takeover Bid Disclosure Law provide:

"A 'takeover bid or takeover offer' is an offer made by an offeror directly or through an agent

**14.** See note 14 on page 796.

by advertisement or any other written or oral communication to offerees to purchase such number of shares of any class of equity securities of the target company that:

(a) Together with the offeror's presently owned shares of that class, will in the aggregate exceed 10% of the outstanding shares of such class; or

(b) Together with an offeror's presently owned shares of all classes of equity securities of the target company, will in the aggregate, after giving effect to all conversion and purchase rights held and to be acquired by the offeror, exceed 10% of the number of shares of stock or a similar security of the target company which will be outstanding." (49 N.J.Stat. Ann. § 5–2(*l*)(1)).

"If an offeror makes a takeover offer for less than all the outstanding equity securities of any class, and if the number of securities deposited or tendered pursuant thereto is greater than the number the offeror has offered to accept and pay for, the securities shall be accepted pro rata, disregarding fractions, according to the number of securities deposited or tendered by each offeree." (49 N.J.Stat.Ann. § 5–9(b)).

**14.** At all times relevant to the instant litigation Rule 390 of the New York Stock Exchange provided:

"(a) Except as otherwise provided by this Rule, no member, member organization, or other person who is a nonmember broker or dealer and who directly or indirectly, controls, is controlled by, or is under common control with, a member or member organization (any such other person being hereinafter referred to as an affiliated person) shall effect any transaction in any listed stock in the over-the-counter market, either as principal or agent.

(b) A member, member organization or affiliated person holding a customer's order for the purchase or sale of a listed stock (the Order) may execute the Order (or such portion thereof as may be so executed in accordance with this Rule) in the over-the-counter market with a third market maker or nonmember block positioner.

(c) The provisions of this Rule shall not apply to any of the following transactions:

(i) any transaction which is part of a primary distribution by an issuer, or a registered or unregistered secondary distribution, effected off the floor of the Exchange;

(ii) any transaction made in reliance on Section 4(2) of the Securities Act of 1933;

(iii) any trade at a price unrelated to the current market for the security to correct an error or to enable the seller to make a gift;

(iv) any transaction pursuant to a tender offer;

(v) any purchase or sale of securities effected upon the exercise of an option pursuant to the terms thereof or the exercise of any other right to acquire securities a pre-established consideration unrelated to the current market for such securities;

(vi) any purchase or sale of any security trading in which has been suspended by the Exchange pending review of the listing status of such security;

(vii) the acquisition of securities by a member organization as principal in anticipation of making an immediate special offering or exchange distribution on the Exchange under Rule 391 or Rule 392;

(viii) any purchase or sale of any of the guaranteed or preferred stocks included within the listing of such stocks as may from time to time be issued by the Exchange, *provided, however,* that every proposed transaction in any such security by a member, member organization or affiliated person should be reviewed in light of the factors involved, including the market on the floor of the Exchange, the price, and the size, so that whenever possible the transaction may be effected on the floor;

(ix) any transaction for less than one unit of trading; and

(x) any other purchase or sale of any security under extraordinary or emergency conditions which receives the prior approval of the Exchange.

(d)(1) The term 'listed stock' as used in this Rule shall mean any security registered on the Exchange (other than subscription rights), the sale prices of transactions in which are reported on the consolidated tape provided for in the plan filed by the Exchange and others pursuant to Rule 17a–15 under the Securities Exchange Act of 1934 (the Act) and declared effective by the Securities and Exchange Commission;

(2) The term 'nonmember broker or dealer' as used in subparagraph (a) of this Rule shall mean any broker or dealer registered in accordance with Section 15(b) of the Act, which acts as a 'market maker' as defined in the Act, or whose gross income is derived substantially from acting as a 'broker' as defined in the Act, or both;

(3) The term 'third market maker' as used in this Rule shall mean a 'market maker' as defined in Rule 15c3–1(c)(8) under the Act, who makes markets over-the-counter in listed stocks and who maintains the minimum net capital required of a market maker by Rule 15c3–1 under the Act; and

(4) The term 'nonmember block positioner' shall mean a 'block positioner' as defined in Rule 17a–17 under the Act which is not a member of the Exchange.

(e) Notwithstanding the provisions of Rule 104, the specialist may buy for his own account on a plus or zero plus tick or sell for his own account on a minus or zero minus tick any or all of the stock which is to be sold or purchased over-the-counter pursuant to subparagraph (b) of this Rule."

plaintiffs are all the persons who, as of the close of business January 16, 1978, owned either BD stock or BD 4⅛% convertible debentures due in 1988 (except, of course, defendants and those who sold BD stock to Sun).

All defendants have answered by denying the basic allegations of wrongdoing. All defendants argue that no cause of action has been stated against them, that all plaintiffs except the Commission lack standing and that none of the plaintiffs have been injured. In addition, Sun, Dickinson, Salomon, Eberstadt, M & D, Lipper and Zeller allege that BD and the individual plaintiffs in 78 Civ. 539 come into court with unclean hands because they embarked on a course of untoward conduct designed to bring political and public pressure and disfavor on defendants. In the enforcement proceedings, Salomon, Eberstadt, M & D, Lipper and Zeller charge that the Commission denied defendants procedural due process in flagrant violation of its own rules of procedure and that it brought this enforcement proceeding in response to political pressure generated by BD. Accordingly, all defendants urge dismissal of the complaints.

The defendants opposed class action certification, but their contentions were held to be meritless. Class certification was grant-ed and defined as stated above. *See Wellman v. Dickinson*, 79 F.R.D. 341 (S.D.N.Y. 1978) (Carter, J.). The class plaintiffs waived their jury trial demands and the Commission agreed to have its case consolidated for trial with those of the private parties. A bifurcated trial dealing only with the issues of liability began on November 13, 1978 and ended on December 8. During the trial Dunning reached a settlement with the class plaintiffs. The parties have made an abundance of pre-trial, trial and post-trial submissions with the latter continuing as late as July 1, 1979. Counsel have been scrupulously diligent in bringing to the court's attention any newly decided relevant cases not cited nor discussed in their pre-trial, trial and post-trial briefs and memoranda. Although all but inundated by the deluge of exhibits and filings in these proceedings, the court is appreciative of the parties' diligence in bringing to the court's attention every conceivable document that might possibly be relevant to the decision.

## II

*Findings of Fact*

■ The background and governing facts [15] in this complex drama embrace per-

---

15. *Evidentiary Rulings*

In the course of the trial the parties filed an overwhelming number of exhibits including depositions, and at its conclusion, the court requested counsel to consult with the court reporters and the deputy court clerk to be certain that all exhibits submitted in open court had been formally recorded as admitted into evidence. Counsel unfortunately assumed that the court was approving a procedure for admission of exhibits whether submitted in open court or not. Counsel made a record of this procedure which took place on December 14, a week after the trial in chief had concluded. It would have been preferable (and this was the court's intent and understanding) that all documents tendered on December 14 were those actually submitted during the course of the trial with a ruling on their admissibility having been made in open court. However, since all counsel assumed they were entitled to offer various exhibits on December 14, whether or not submitted during the trial, and to make their objections, if any, for post-trial rulings, the court has to assume some responsibility for such a uni-

versal misunderstanding. Accordingly, the procedure is accepted, albeit reluctantly, and the court will rule on objections. The objections to the following plaintiff exhibits not ruled on at trial are sustained: Pl.Ex. 6, 9, 27, 29, 75, 76, 77, 79, 85, 87, 196, 201, 208, 210, 219, 220, 232, 239, 240, 241, 242, 243, 252, 253, 287, 300, 302, 309, 310, 315, 338, 352, 355, 358, 372, 379, 408, 410, 411, 412, 413, 414, 415, 416, 417, 418, 419, 420, 421, 422, 423, 424, 425, 426, 427, 428, 429, 430, 431, 433, 437, 438, 439, 440 and 442. These objections are sustained on the grounds that the exhibits are hearsay, cumulative, not in point or just unreadable. The remainder are admitted. Some documents objected to, which have been admitted, could also qualify as hearsay. However, some, such as Pl.Ex. 382–405 (transcripts of proceedings before the Commission) are not being admitted for the truth of what the documents contain but merely to show that the proceedings occurred; others are in keeping with what has already been established on the record, and no purpose is served by keeping them out.

sonality conflicts, animosity, distrust, and corporate politics, as well as a display of ingenuity and sophistication by brokers, investment bankers and corporate counsel.

Fairleigh S. Dickinson, Jr. was the son of one of the founders of BD. He held the reins of the company from 1948 until 1973. When he became BD chief in 1948, BD was a private family enterprise with gross sales of 10 million dollars annually. When he released the reins of the company in 1973, it was a public company with gross sales of $300 million annually. Dickinson loosened his hold on the helm but did not entirely let go. In 1974, he stepped upstairs to become Chairman of the Board, while Wesley Howe became Chief Executive and Marvin Asnes became Chief Operating Officer. Differences between the management team and the chairman became evident in late 1976 when Dickinson threatened to fire Asnes.

Sometime prior to January, 1977, Howe became interested in the acquisition by BD of National Medical Care Corp. Negotiations went well, and BD announced a proposed merger with the company in January, 1977. Without advising the board or management, Dickinson engaged the services of Salomon and Eberstadt to look into the proposal and advise him about it. Dickin-

The objections to Pl.Ex. 12, 123–132, 187, 188, 192, 237, 255 and 295 highlight my unhappiness with the procedure used in re the offering of the exhibits for admission. Had the above exhibits been submitted in the court's presence, I would have insisted that counsel reach agreement on getting the facts set forth in these documents before the court—the number of accounts involved in the sale to Sun, whether the accounts were discretionary or non-discretionary, the number of discretionary accounts not sold and the number of non-discretionary accounts sold. The solicitees supplying the above exhibits were deposed, and their depositions were made a part of the record. The above factual data for the most part merely support the deposition testimony, and there should be no question concerning their reliability. In one instance there is a reconstruction, and it is indicated that the result is an approximation. I see no reason, therefore, why the above exhibits should be excluded insofar as they recite the factual data set out above. Expressions of opinion or any matter apart from the indicated factual data are not to be considered a part of the exhibit admitted into evidence.

The defendants' exhibits objected to are Def.Ex. 137, 138, 139, 140, 141, 142, but they seem to be the same as Def.Ex. 126–136 which were not objected to, so they are admitted. Def.Ex. 197–203 are evidence of BD political activity, 335 halt of trading, 345–361 political action, 363–371 political action, 373–379 political activity, 389–396 political activity, and 400–410, 412 political activity. All are admitted. While all these documents qualify as hearsay, they do no more than establish what the deposition testimony of BD officials and employees already concedes. Def.Ex. 415–421 are toll calls. I do not understand the relevance of these documents and the objection is sustained; 446 does not seem to be in point, nor does 451 or 452. The objection to 475, the Kerley affidavit, is overruled. Kerley's deposition testimony is a part of the record and I see no reason to keep his affidavit out. Objections to 490–493, 524, 527–531, 533–537, 551–554, 586–593 are sustained on grounds of hearsay or lack of relevance. 576, 583, 593 and 594 are admitted.

In addition, defendants have filed with their post-trial briefs a submission designated Appendix A. As finally submitted, this appendix consists of some 7 boxes of summaries and analyses of 37 stock purchase transactions and related materials. As originally filed the appendix was a single volume containing excerpted materials from these 37 transactions. The Commission objected to this submission on the grounds of selective summarization, and the parties sought to agree on the compilation of an appendix. Unfortunately, they were unable to do so. The purpose of this submission is to demonstrate that all of these 37 acquisitions have some of the features of the instant transaction and were deemed by a court or the Commission not to be tender offers within the meaning of the Williams Act.

The court cannot accept these documents as part of the evidentiary proof under present circumstances. They should have been submitted during the trial when the court could have heard argument pro and con, asked pertinent questions and been satisfied one way or the other on their admissibility. Defendants contend the court may take judicial notice of these filings, but that cannot be so. A document certified by the Commission is admissible without more, Rule 902, Fed.R.Ev. as a public record, but these are not Commission executed materials. Nor can they be admitted under Rule 201, Fed.R.Ev. as facts generally known in this district. The documents merely constitute matter filed by third parties with the Commission, and the court cannot rely on the truth or accuracy of third party documents submitted to the Commission. See Section 26 of the Exchange Act, 15 U.S.C. § 78z. Indeed, the Commission here is contesting filings made with it in this very case. Accordingly, the objection to Appendix A is sustained.

son was a personal friend of William Salomon, a senior partner of Salomon, and Eberstadt had been BD's investment banker. Robert Zeller, Eberstadt's chief executive, had arranged the first underwriting in 1962 when BD became a public company, and until 1975 had performed the same function when BD made additional public offerings. In addition, Zeller had advised Dickinson on the handling of some of his personal affairs. Both Salomon and Eberstadt filed negative reports on the National Medical Care proposal. Dickinson sent the Salomon report to BD board members in February, and on March 3 ,at a meeting of the Executive Committee, the proposal was abandoned.

Intrigue deepened at BD. Howe's secretary, Dorothy Matonti, began listening to telephone conversations that Dickinson's administrative assistant, Adele Piela, had with Jerome Lipper, Dickinson's attorney, and Board members. Matonti copied Piela's shorthand notes and material from Dickinson's appointment book, and Piela's secretary and Dickinson's driver kept Matonti informed of Dickinson's activities. This surveillance was duly recorded in memoranda given to Howe. On March 27, Dickinson held a meeting with Salomon attended by Kenneth Lipper, his brother Jerome Lipper, Dr. Edwards, an employee of BD, and several BD directors. At the meeting the participants discussed the financial community's reaction to changes in BD that Dickinson was contemplating. Dickinson apparently felt he had sufficient power in the company to bring about a change in management. Events, however, were soon to prove him wrong.

In early April, Dickinson, Howe, and Asnes met, presumably to bring their differences into the open and to resolve them. The meeting settled nothing. Howe and Asnes then decided on a show of strength. They canvassed the board, found enough votes to get rid of Dickinson, and on April 18 sent out notices for an April 20 meeting.

Jerome Lipper knew the purpose of the meeting but Dickinson did not attend. Whether this was because Dickinson had also counted the votes, we do not know. At any rate, he spent part of the day in Washington, and part in Baltimore with Dunning. Howe prevailed. Dickinson was deposed as chairman and nudged out the back door with the title of Honorary Chairman.[16]

Obviously this must have been a terrible personal blow. Dickinson was now stripped of all power within what he must still have regarded as a family enterprise. On April 21, Dickinson had a meeting at Salomon to secure advice on how to proceed. Richard Rosenthal, John Gutfreund, and Kenneth Lipper of Salomon, two BD directors, Kane and Thompkins, Jerome Lipper and Salomon Brothers counsel, Martin Lipton were in attendance. The meeting centered on BD's trouble and the possibility of restoring Dickinson to power. A lawsuit based on procedural irregularities at the board meeting was ruled out. Nor was a proxy fight considered a viable option when the small percentage of total BD shares Dickinson held was revealed. Although Dickinson and members of his family still held the largest segment of stock in the company, acquisitions, public offerings and the sale of some of their holdings had caused their aggregate portion to be reduced to approximately 5% of BD's outstanding shares. Discussion then turned to more practical solutions, e. g., for Dickinson to sell his shares on the open market to BD or to a third party, or to bring pressure on management through the outside directors. Dickinson vetoed the idea of selling his stock on the open market since he felt that that course would leave the shareholders of BD saddled with bad management. He accepted two remaining options—to vote with outside directors to bring pressure on management and to sell his stock to a company interested in a takeover of BD—and engaged Salomon for the latter purpose.

16. In September, 1977, Dickinson was terminated as a BD employee, and in December, 1977 he was dropped from the list of directors to be elected at the BD annual meeting in February.

A few days later, on or about April 25, Dickinson advised Zeller that he was asking Salomon to involve Eberstadt in the effort to interest a company in acquiring his stock. Zeller confirmed these arrangements with Gutfreund.

At first, the relationship of Dickinson to Salomon and Zeller as principal and agent or broker for the sale of Dickinson's stock was merely an oral understanding. Events during the summer of 1977, however, caused the parties to alter the arrangement. By that time, there had been merger discussions with Avon Products Co. ("Avon") and American Home Products Corp. ("AHP"), and William LaPorte, chairman of the board of AHP, had met with Howe and Henry Becton, Dickinson's successor as chairman of the board of BD, seeking BD management's approval of an AHP acquisition. Howe was thus aware that Dickinson was seeking a takeover of BD by another company. Joseph Flom, BD counsel, called Lipton and threatened a lawsuit if Dickinson continued to try to secure a buyer for a large percentage of BD stock. Lipton suggested to Salomon that it secure an indemnification from Dickinson. Lipton drafted such a document for Dickinson to sign and sent it to Kenneth Lipper in July. Jerome Lipper and one of the senior partners of Salomon were opposed to the idea, but in late September or October, Flom renewed his threats to Lipton. Lipton again advised Lipper to have Dickinson sign the indemnification. This time Lipper took the document directly to Dickinson. He agreed to sign it, and after Jerome Lipper made some modifications, the revised document was signed by Dickinson and Kenneth Lipper. The letter of indemnification is dated October 12, 1977, and it confirms Dickinson's engagement of Salomon "in connection with seeking an offer for [his] shares" of BD stock. Dickinson agrees to indemnify Salomon against all claims relating to or arising out of the firm's acting on his behalf in securing a buyer for his stock.

From the spring of 1977 forward, Salomon and Eberstadt, particularly Lipper and Zeller, worked zealously to interest a company in acquiring a minority interest or in buying 100% of BD. Between April 25 and December, 1977, Salomon and Eberstadt arranged meetings with Avon, AHP, Monsanto Corp., ("Monsanto"), Hoffman-LaRoche, Inc. ("Hoffman-LaRoche"), Shering-Plough Corp. ("Shering-Plough"), Squibb Corp. ("Squibb"), and Sun in an effort to interest those institutions in acquiring a position in BD. Dickinson himself participated in these activities until late December when he was hospitalized for about one month. In part, these efforts failed to bear fruit before Sun Company came on the scene because most of the other corporations were not interested in a takeover attempt in the face of hostile management. Since Sun's strategy was to move as quickly as possible, without public notice, the hostility of management was no deterrent.

The campaign to find a company interested in buying Dickinson's stock as part of a BD takeover bid was launched without delay. The first contact was a telephone call to David Mitchell, Chief Executive of Avon, by either Richard Rosenthal or John Gutfreund to indicate Salomon's desire to discuss the BD situation with Avon's representatives. Eberstadt had earlier in the year initiated discussions with Avon about a possible merger with BD. Zeller had arranged a meeting in January, 1977 between Dickinson and Mitchell. Zeller was set to sponsor a meeting between Howe and Asnes and representatives of Avon to secure management's consent to such a merger, but the National Medical Care Corp. issue intervened, and further negotiations aborted.

After speaking to the Salomon representative, Mitchell asked Robert Greenhill, managing director of Morgan Stanley, Avon's investment banker, to meet with Salomon. Greenhill followed through, and a meeting at Salomon was held on April 27. In attendance were Rosenthal, Gutfreund and Lipper of Salomon, John Hogan of Eberstadt, Greenhill and Bradford Evans of Morgan Stanley and Lipton, the attorney. Dickinson was not present. Gutfreund related Dickinson's disenchantment with BD management and his desire to dispose of his

BD stock. Gutfreund advised Greenhill that Salomon and Eberstadt were working on Dickinson's behalf and that Dickinson's stock and a block of stock they represented would be useful to Avon in acquiring BD. Gutfreund proposed that Morgan Stanley, Salomon and Eberstadt work together on the matter. Greenhill countered that Morgan Stanley was Avon's exclusive representative. He then asked how much stock they were talking about. The reply was 20%, but on closer questioning, he was advised that they presently controlled 9% of BD stock and believed 20% could be delivered. Dickinson's daughter was mentioned. No specific price was discussed except a premium over the market that related to acquisition of a controlling interest. Greenhill inquired whether a group had been formed and whether a form 13(d) had been filed. The reply was negative. He then addressed Lipton and Rosenthal directly, "does this mean that a group has been formed and that a 13(d) [has been] filed . . . ." The response given was "no 13(d) has been filed" (Tr. 1098–99). Greenhill indicated that Avon had no interest in a block of stock unless BD management would be receptive to Avon's acquisition, and that Avon would not proceed unless it could explore with BD management its attitude about the potential combination and the business future of the combined operation.

When the meeting broke up, Greenhill shared a taxi with Lipton and spoke to Lipton about filing a 13(d) statement. Lipton replied that he had only just become involved but would look into the matter. Greenhill spoke to Mitchell the next day to confirm the correctness of the statement he, Greenhill, had made at the meeting that Avon would only be interested in an acquisition with the cooperative participation of BD management, and Mitchell agreed. Greenhill so advised Rosenthal, and that conversation ended the Avon episode.

Lipton does not recall the discussion at the April 27 meeting and during the taxi ride about the group or failure to file a 13(d) form. Sometime after the April 27 meeting, however, Lipton learned that M & D was investment adviser to Chemical Fund which held approximately 500,000 shares of BD stock.[17] In either May or early June he had Zeller and Lipper meet with him to discuss whether in view of Eberstadt's relationship to Chemical Fund, a 13(d) filing should be made. Zeller advised Lipton that Eberstadt and Chemical Fund were independent of each other; that there was no relationship between Eberstadt's investment banking function and Chemical Fund; that investment decisions for the fund were made by a majority of Chemical Fund's independent or outside directors and that Eberstadt had no authority to make such decisions for the fund. He also advised Lipton that the Chemical Fund was represented by Sullivan & Cromwell and that Stephen West, the partner-in-charge, had reviewed the matter and concluded that no problem existed. West's recollection is not so specific or pointed, and he remembers the discussion with Zeller about a 13(d) filing and group membership in relation to Chemical Fund as occurring after this conversation with Lipton. At any rate, Lipton was familiar with the *Tannenbaum v. Zeller* litigation [18] and was personally acquainted with Roger Murray, one of Chemical Fund's outside directors who is very knowledgeable in the securities field. He accepted Zeller's explanation and concluded that all was well and that there was no need to make a 13(d) filing.

With Avon eliminated, Zeller and Lipper in late April and early May sought without success to interest Bristol Myers and Pepsico in the acquisition of BD. Dickinson then decided to take some initiative on his own. On May 10, at William Salomon's suggestion, Dickinson called William LaPorte,

**17.** Chemical Fund did not hold 500,000 BD shares, but the combined Eberstadt interests—Chemical Fund, Surveyor Fund, and advisory accounts—did have approximately that number of BD shares.

**18.** *See Tannenbaum v. Zeller,* 399 F.Supp. 945 (S.D.N.Y.1975) (Carter, J.), *remanded,* 552 F.2d 402 (2d Cir. 1977), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1978).

Chief Executive of AHP, whom he knew socially and who was then in the Philippines. Dickinson asked LaPorte whether the latter felt a discussion of the association of the two companies, BD and AHP, would be worthwhile. He told LaPorte that Salomon was acting on his behalf and that Kenneth Lipper, a Salomon partner, would be calling him shortly. Lipper did call sometime thereafter. He told LaPorte that Dickinson was seeking a company desirous of merging with BD; that Eberstadt held 500,000 BD shares in Chemical Fund and that these, along with Dickinson's and Dunning's shares were available and would go with the deal; that approximately 2.5 million shares could be acquired, roughly 16–17% of the total shares; that some 813 shareholders held 17.5 million shares of the 19 million outstanding BD shares, and that in the event LaPorte decided on the acquisition of BD, Dickinson would want to be chairman.

LaPorte met with Dickinson when he returned to New York, about 2 weeks later on May 24, and they discussed the possibility of a merger of the two companies. On May 25, LaPorte met with Zeller, Lipper, Gutfreund and Rosenthal. LaPorte was again advised that they were seeking to sell Dickinson's stock. The meeting bogged down because LaPorte sought to make certain that AHP was not assuming any obligation to pay Eberstadt or Salomon, and throughout LaPorte offered only a very small premium over market price. A flurry of meetings then took place. LaPorte met again with Dickinson along with Dunning and several other BD directors. Dickinson sent his private plane to Baltimore to bring Dunning to this meeting. LaPorte met with Salomon a second time, and he also met with Howe and Becton, but neither manifested interest. He sent letters to each director spelling out AHP's interest and the proposed terms for a merger of the two companies. On June 22, BD's board of directors rejected AHP's proposal and issued a public statement giving notice of its strong desire to remain an independent company. Thereafter, Lipper called LaPorte and sought to persuade him to continue his efforts to acquire an interest in BD

despite BD management's hostility. Lipper assured LaPorte that Dickinson would support any effort he made. LaPorte, however, considered the hazards too great to attempt a takeover of BD against hostile management and on June 27 advised Dickinson's representatives that he was withdrawing from the field.

The next corporation Salomon and Eberstadt sought to interest in acquiring BD was Hewlett-Packard, which Salomon contacted in August without success. Later in August, Salomon, subsequently joined by Zeller and Dickinson, began discussions with Monsanto and with John Whitehead, senior partner of Goldman Sachs & Co., investment bankers for Monsanto. On September 20, Lipper had breakfast with Whitehead, luncheon with John Kerley, executive vice president of Monsanto, and that evening hosted a dinner at his apartment to enable John Hanley, Monsanto's chief executive, to meet directly with Dickinson and question him about BD. Beside the three already named, Whitehead and Kerley were present as was Zeller, Jerome Lipper, William Salomon, Mrs. Kenneth Lipper and the Lipper children. This was apparently a long dinner meeting, and Hanley used the occasion to question Dickinson closely about the origin of BD, the nature of its business, recent disagreements between him and management and Dickinson's desire as to the disposition of his own stock. Dickinson indicated that animosity between him and BD management had fueled his determination to sell his shares and that his disenchantment was shared by others whom he felt would also be interested in selling their shares. Dickinson asserted that he and his family held 1,200,000 shares: some shares he owned directly, but others were held in trust. While he could not commit the stock in trust, he expressed reasonable confidence that 1,200,000 shares were available. In addition, Dickinson indicated that friends and associates of his, mentioning Dunning by name, were equally distressed and that their holdings aggregating 1,300,000 shares were also for sale.

Although Whitehead could not recall whether Zeller, Lipper, or Dickinson made any reference to the 500,000 shares of Chemical Fund at the dinner, he came away with the "clear understanding that the 500,000 shares that were owned by Chemical Fund were part of the shares that were being talked about." But Whitehead could not be certain whether that understanding resulted from discussions at the dinner meeting or from what he had learned earlier (Tr. 1171). In the prior weeks either Zeller, Dickinson or Lipper had told him "that there were 500,000 shares owned by Chemical Fund that were for sale" (Tr. 1174). The price defendants suggested to Whitehead was 10% premium over the market price.

Whitehead had a final meeting in October with Lipper, Zeller, Rosenthal and Lipton. He expressed a desire to talk to BD management before making a decision, but Lipper and Zeller were unwilling to arrange such a meeting. Later in October Monsanto advised Salomon that it had no further interest.

In late October, Zeller attempted to interest Shering-Plough in purchasing an interest in BD. Zeller indicated that the Dickinsons' family-held shares of 1,200,000 were available, plus 400,000 shares controlled by Edward Scarff, and 350,000 shares owned by Dunning. He also represented that there were 500,000 shares held by Eberstadt managed funds, but that their disposition had to be determined by the appropriate people. A number of meetings ensued in which Shering-Plough representatives were told by Zeller that 2,500,000 shares were readily available and that it would not be difficult to proceed from that base to a 20% acquisition. Shering-Plough decided, however, that it was not interested in attempting a takeover of BD against hostile management, and it removed itself from consideration.

At roughly the same time these negotiations were taking place, Allan Lowenstein, a New Jersey attorney, asked Dickinson's permission to talk to Robert Clark, a personal friend and president of Hoffman-LaRoche, about acquiring an interest in BD. Lowenstein called Clark on November 22. Lowenstein said that Dickinson's interests controlled approximately 15–20% of all BD shares outstanding. The two had a number of telephone calls culminating in a meeting and luncheon attended by Clark, Lowenstein and Robert Johnson of Loeb Rhoades, Hoffman-LaRoche's investment banker. Lowenstein stated that with the holdings of Dickinson and those in sympathy with him, including Dunning's and Chemical Fund's shares, a 15–20% position could be purchased, and then the company could proceed to obtain the remaining shares. The conversations seemed to be going well. Johnson had meetings with Salomon, and he was pressured for early action because another company was also interested in a BD takeover. Lowenstein advised Clark that a decision should be made before BD's annual meeting in February because Dickinson was afraid management would put through a charter amendment substantially increasing the authorized capital stock. In mid-December Clark advised Lowenstein that Hoffman-LaRoche could no nothing before March, and because of the February deadline, it removed itself from contention.

Sometime late in October, 1977, Dickinson lunched with Robert Furlaud, chief executive of Squibb, and related to the latter his disenchantment with the state of affairs at BD and his interest in selling his holdings in the company. Furlaud was unenthusiastic but agreed to further discussions. On November 10, Dickinson, Furlaud and George Maginness, a Squibb vice president, lunched together. Dickinson talked of wanting to sell his own BD stock and his family holdings to Squibb. He stated that his financial advisors could give more detailed information. On November 14th Maginness had a meeting at Salomon with Kenneth and Jerome Lipper and Zeller. Kenneth Lipper suggested that BD would be a good investment, that Salomon and Eberstadt could secure up to 20% of all BD stock for Squibb, and that such an acquisition would provide the base for a possible takeover. He offered to send a further analysis from Salomon. Maginness' reac-

tion was negative but he agreed to give the matter further thought. A few days later Kenneth Lipper called Maginness to inquire whether he had reconsidered. When reminded of his promise to send additional material, Lipper mailed Salomon's calculations to Maginness about one week later. This, however, failed to convince Furlaud or Maginness that the proposition was attractive, and Salomon was so advised.

Harry Sharbaugh, Sun's chief executive, had determined in 1977 that Sun needed to diversify by investing in institutions outside the energy field. Sun sought the acquisition of no less than a 20% interest and not more than a 50% interest in 3 or 4 companies over the succeeding two or three years by investing some 300–400 million dollars in each organization. Sun's corporate development committee was given responsibility for developing major acquisition opportunities for Sun. In August, Salomon was engaged to undertake some studies in connection with Sun's diversification program and Horace Kephart, a senior vice president concerned with corporate development and diversification, was given responsibility for dealing with Salomon. Kenneth Lipper was one of the Salomon partners in charge of the Sun account. Thus, the stage was now set for the main event.

Kephart discussed Sun's diversification program with Lipper, and in late November the two, met at Salomon. Kephart was given a copy of BD's annual report, and Lipper suggested that Sun might consider BD as an acquisition possibility in its corporate development program. After studying the report, Kephart had further conversations with Lipper about BD. He learned about the rift between Dickinson and management, and about Salomon and Eberstadt's connection to Dickinson. In these discussions Kephart was told that a block of roughly 15% of BD shares was available, and that this included 1.2 million shares owned by Dickinson, 400,000 shares owned by Lufkin, 500,000 shares owned by Chemical Fund and 300–400,000 shares owned by Dunning. He was also informed that BD was attempting to buy back Dickinson's stock, and that Dickinson had refused but would be willing to sell his shares to a major company. Kephart further learned that BD had publicly announced in June its desire to remain independent and had hired special counsel to assist it in resisting any takeover efforts. Moreover, Lipper told Kephart that a foreign company (Hoffman-LaRoche) and a domestic chemical company (Monsanto) were ready to move to acquire an interest in BD after the first of the year, giving Kephart the impression that speedy action was needed.

In early December, Kephart attended a meeting of Sun's senior executives and mentioned BD as a possible acquisition opportunity. Sun's business analysis group, which was support staff for the corporate development committee, was assigned the task of making a business study of the health care field in general and BD in particular to determine whether an investment in BD would make sound business sense.

On December 20, at Sun's headquarters in Radnor, Pennsylvania, the business analysis group presented its findings and conclusions to Sun's senior executives. Among those in attendance were Sun's two top executives, Sharbaugh and Theodore Burtis, its president. Six other acquisition possibilities were also recommended. There was general agreement that the matter should be explored further. Pursuit of BD as an acquisition possibility was given priority over the six other companies recommended by the business analysis group because Lipper had advised Kephart that "other companies [were] in the process of taking action to acquire" an interest in BD (Tr. 134). Lipper suggested that Sharbaugh call Dickinson personally and make arrangements to meet him. A meeting through Lipper was proposed so that Sharbaugh and Burtis could talk to Dickinson face to face. Such a meeting was first set for December 20 and then cancelled and rescheduled for January 3 or 4. However, Dickinson became ill and required hospitalization, causing the meeting to be cancelled again.

On December 22, Kephart assembled a study team of Sun executives to carry the

analysis of the potential BD acquisition to "the next stage of sophistication" (Tr. 168). That is, this group "was to find out more about the health care products industry and [BD] in preparation for future reports to senior management [and] the board" (Tr. 169–170). In short, it was to provide top executives with necessary information to enable them to make an informed determination on whether to acquire an interest in BD.

On December 27, there was a meeting in New York attended by Sun's study team, Salomon, Eberstadt, Arthur Andersen and James Fogelson of Wachtell, Lipton (Salomon counsel), at which possible strategies for acquiring BD were discussed. Partial tender was dismissed as having a limited chance of success, and a friendly takeover bid was ruled out. There was discussion of soliciting individuals and institutions. Kephart was shown a list of available holdings including Dickinson's, Dunning's and Lufkin's. By this time he knew that a large percentage of BD shares were held by institutions, and he was assured that the Chemical Fund's 500,000 shares were available to Sun. Rosenthal proposed a two tier price—a higher price with no recourse and a lower figure with a guaranty to make up the difference between the lower price and the highest price eventually paid for any shares acquired. This was the so-called most favored nation clause, and the idea was accepted in principle. It was understood that a premium over the market was a prerequisite.

There was further discussion at Radnor, Pennsylvania on January 3 and 4 by the study team, Sun officials, Salomon, Eberstadt and Fogelson, all of whom were brought together by Kephart in preparation for a presentation on January 5 to Sun's board. Kephart prepared and Sharbaugh signed a personal and confidential letter for study by the board members at the January 5 meeting, which stated that a block of 15% of the shares of BD was available and an additional 10–20% could be quickly acquired. Kephart testified at trial that he had counted Dunning's, Lufkin's and Dickinson's in the 15% calculation. On January 5, Kephart presented the study team's findings to the corporate development committee at a meeting to which members of the board were invited to attend in informal session. The board heard the presentation. It was not asked to vote, but Kephart stated that a decision had to be made within a week. The consensus was that the matter should go forward. On the next day Wachtell, Lipton was employed as Sun's counsel and thereafter, Cleary, Gottlieb, Steen & Hamilton ("Cleary, Gottlieb") was employed by Salomon.

On January 9, there was a meeting of lawyers at Salomon. The lawyers indicated that the law regarding tender offers was still murky and that the concept of a tender offer had not been precisely defined. The lawyers wanted to structure a "privately negotiated" transaction. Fogelson and Charles Nathan of Cleary, Gottlieb felt this required that those solicited be limited in number. One felt that up to 60 solicitees was safe; the other argued for an upper limit of 40, but within those limits the lawyers felt there would be no problem.

Between December 22 and January 13 (when the executive committee authorized the acquisition and the expenditure of up to 350 million dollars), the study group was engaged in the examination of a myriad of alternatives. The study team knew that 10–13% of BD shares were held by non-management individuals who were willing to sell and that a large percentage of BD stock was in the hands of institutions. The study team concluded that the optimum percentage level for Sun to reach was over $33\frac{1}{3}\%$. At that level, Sun could utilize equity accounting and would have sufficient holdings to have a significant voice in BD's future direction. Even if BD increased the number of authorized shares, Sun's strength could not be diluted enough to frustrate these two objectives. The study team considered it acceptable for Sun to hold 20–30% of the stock for a short time, but a percentage in excess of $33\frac{1}{3}\%$ was the basic objective.

On January 10 and 11, Kephart and the study team, augmented by Salomon (Rosen-

thal, Lipper, Gutfreund), Eberstadt (Zeller), Fogelson, Howard Blum, Sun's staff counsel, and Nathan met in Sun's headquarters to devise final recommendations to present to the Sun Board. There was an extended discussion of strategy. Kephart led the discussion, considering (1) open market purchases, (2) a conventional tender offer, and (3) private purchases. In the face of a hostile target, a conventional tender offer was not considered attractive. It was felt that it would lead to competitive bidding which would make the desired acquisition more expensive, and there was certain to be time consuming legal maneuvering to try to thwart the acquisition effort. What was needed was a procedure that would enable the acquisition to be effectuated quickly and put Sun in physical possession of the shares in the shortest possible time. There was a discussion of legal risk, but this was not a concern about the risk of litigation itself since everyone accepted that as inevitable. Rather, the participants were concerned with the chance that Sun's objective would be thwarted in mid-stream by legal maneuvers.

Four possible strategies were listed by Kephart on a blackboard and rated in terms of legal risk, quick control and price: (1) to seek shares sequentially, first from individuals, then from institutions; (2) to seek shares simultaneously from these two groups; (3) to tender immediately; and (4) to contact management.

Simultaneous acquisition was considered the most desirable in terms of quick control and price, although there was a measurable legal risk that the effort would be aborted. Sun was advised by its lawyers that the exact boundary line between a private purchase and a tender offer had not been defined in the law. Nonetheless, the lawyers believed simultaneous purchases from large individual and institutional shareholders, carried out off the market after the New York Stock Exchange had closed and with as much secrecy as possible, constitut-

ed the strategy best suited to meet Sun's needs. The tender offer approach was rated best in terms of legal risk, but disadvantageous in terms of price. It would also give BD a wide opportunity to make counter moves. The lawyers felt it necessary to keep the solicitees limited in number in order for the acquisition to be considered a private transaction. There were discussions of the possibility of attaining the objective with purchases from 4 individuals and 6 institutions, but approaching as many as 40 solicitees was discussed. In order to avoid possible infraction of Rule 390, NYSE, the lawyers advised that a Sun official, not Salomon or Eberstadt, had to accept the solicitees' agreement to sell their shares. Also, there was a discussion of the New Jersey Corporation Takeover Bid Disclosure Law, and the lawyers sought to steer clear of that statute.

On January 11, these recommendations were presented to Sun senior officials. On January 13, the executive committee approved the "private transaction" proposal and authorized a $350 million expenditure for a 34% acquisition. Burtis testified that the maximum authorized was 38% of BD's outstanding shares, but Sharbaugh recalled the upper limit percentage as being 40%–50%. Salomon and Eberstadt were engaged at a fee of $350,000 each, conditioned on Sun's acquiring at least 20% of BD stock, and Sun provided each with a letter of indemnification.

On January 11, Fogelson, Nathan and Blum carefully considered the approach to be made to solicitees. When they learned that the strategy envisioned approaches to a number of individuals and institutions, they initially wanted Rosenthal to make all the solicitations. When he said that was impossible because there were too many solicitees, the lawyers decided on preparing two scripts: one for those soliciting individuals and a second one for those soliciting institutions.[19] The instructions stressed

---

**19.** *OUTLINE FOR MAJOR INDIVIDUAL INVESTORS*

1. Stress Need for Absolute Confidentiality
 (a) To make transaction possible
 (b) To avoid liability under securities laws.

2. Provide outline of proposed transaction, including—
 (a) Name of purchaser.
 (b) General nature and scope of purchase program.

confidentiality and it was agreed that a lawyer would be at the side of each solicitor to monitor the latter's side of the conversation.

 (c) Minimum number shares sought and ultimate goal.

3. Determine *precise* details of investor's shareholdings and those of his family, including how registered, where securities located, whose approval needed for sale. Way shares held may affect ability to buy, since

 —May not make offers to more than 10 shareholders resident in New Jersey
 —Assume that each member of family and each trust will count as separate New Jersey shareholder.
 —Same true holdings of close friend (FD)

4. Terms of Offer
 (a) Purchaser not able to make absolute commitment until minimum investment is assured. Thus final commitment from Purchaser must await results of institutional contacts.
 (b) Price being offered and "most favored nation clause" [N.B. If raised by seller, no discussion of any kind concerning installment notes. Have lawyers work out all details].
 (c) Because of restriction on offers to 10 N.J. residents, only want to discuss several biggest blocks. This to leave room to make offer to close friend.
 (d) To avoid any possible breach of confidentiality, *no* offer to trusts or other holdings where action or approval by a co-trustee or other party is required.
 (e) Offer initially limited to 950,000 shares to avoid technical Section 13(d) questions re formation of family group. This not clear and lawyers still considering.
 (f) Depending on reaction of friend and further evaluation by lawyers, may come back for additional shares, including trust shares.
 (g) Goal of Purchaser is to acquire as many shares from investor and family as possible, consistent with law and interests of friend.

5. Approach to Friend
 (a) Will he maintain absolute confidentiality? Any risk of his feeling obligated to inform target?
 (b) Who can best make approach re:
 —Friend's interest in selling
 —How friend holds stock [needed because of 10 N.J. shareholder rule]
 —Tax and estate planning considerations
 (c) Note possible considerations re friend:
 —approach may require joint filing under Williams Act because of argument have formed group
 —target may sue everyone in sight, including sellers

 (d) Any approach to friend must emphasize absolute need for total confidentiality.
 (e) What is best timing re approach to friend?
 —where he is now?
 —where will he be this week?
 —what is his likely reaction time?
 —how and from whom does he take tax and estate planing advice?

### OUTLINE FOR INSTITUTIONS
#### I. MANDATORY SELLING POINTS

1. Emphasize that transaction cannot proceed unless absolute confidentiality is maintained by all parties. Also warn of risk of seller becoming member of a Williams Act group with filing responsibility if talks to others.

2. Emphasize that your principal will not finally commit to purchase until a block meeting its minimum requirements is assembled.

#### II. PERMISSIBLE SELLING POINTS

1. If institution expresses reluctance to agree because of future expectations, you may point out that its refusal to sell may preclude reaching minimum target and that your principal has no intention of going forward in such event. If this transaction is not consummated because principal can't assemble block, institution's expectations will be defeated.

2. As is customary in block transactions, you may state both the minimum size requirements for the block and the status of sellers' commitments at the time.

#### III. DON'TS

1. Do not characterize the price as a "take it or leave it" proposition. Be appropriately responsive to negotiating initiative by institution.

2. Do not impose a time constraint or institution's response shorter than is customary for institutional block purchases.

3. Do not disclose identity of principal unless absolutely necessary to consummate the transaction and, in any event, not before the minimum size requirement for the block has been reached. If identity of principal is disclosed, make clear that purchase contract will be executed by subsidiary of principal.

4. Do not go beyond language in draft purchase agreement prefacing the "most favored nation" provision in response to questions regarding the intent of your principal.

#### IV. POST–COMMITMENT INSTRUCTIONS

1. If transaction with institution is *without* most favored nation clause, point out that contract will be amended by deleting last paragraph.

2. *Execution of Contract.* A representative of your principal will present a completed purchase contract (in form already submitted to

Rosenthal's two tiered price offer with a most favored nation clause was agreed upon. At his suggestion, solicitees were to be offered a top price of $45 per share with no recourse or $40 per share with the right to receive the highest price subsequently paid to any other solicitee. It was the understanding of Salomon, Sun and Eberstadt that all solicitees would get the benefit of the highest price paid.

Blum advised Rosenthal that the price should be negotiated, not fixed, and that if another price were suggested by solicitees, it should not be rejected but referred back to Sun. He told Rosenthal that there should be no specified time to respond, but Rosenthal said time deadlines would be set within the time frame normally allowable in block trading. Rosenthal was told that the principal was not to be disclosed and that solicitees should be told to keep the matter confidential, lest a 13(d) group develop as a result of leaks.

Kephart advised Lipper on January 13 that the executive committee had given the go ahead sign. He authorized the making of an offer to Dickinson and Dunning prior to January 16. In mid-December, Lipper had sent Dickinson Sun's annual report. Lipper, Zeller and Jerome Lipper arranged to see Dickinson in his hospital room the next day, January 14. Dickinson was told that the matter must be kept confidential and that Sun was the purchaser. After the price options were outlined, Dickinson indicated that he was ready to accept but only if the proposal was presented to Dunning as well. Dickinson chose the $45 price and asked that his shares be paid for with a cash down payment and the remainder in installments. He was told that the propriety of the installment payments would have to be referred to the lawyers.

After assuring them that he could vouch for Dunning's discretion, Dickinson called Dunning from his hospital room and spoke to him while Jerome and Kenneth Lipper and Zeller were still present. He told Dunning that Salomon and Eberstadt had brought him an attractive proposal for the sale of his BD stock but "he was conditioning his acceptance" on the same offer being made to Dunning (Tr. 2467). He identified Kenneth Lipper and Zeller to Dunning, indicated that they desired to go to Baltimore to talk to him as soon as possible about the sale of his stock, and requested that Dunning see them the next day. On completing the call, Dickinson advised Zeller and Lipper that Dunning would see them, and they agreed to get to Dunning's home in the early afternoon of January 15. Mrs. Turner then arrived in Dickinson's hospital room, and Zeller and Lipper offered her the same proposition offered to her father. Zeller and Lipper kept their appointment the next day with Dunning and made the proposal to him. Dunning liked the proposition and promised to advise them as soon as he talked to his brothers and to his co-trustee.

Kephart was authorized to go to New York on January 16 to supervise the solicitations, and he was instructed not to deviate from the agreed upon two tier price without getting prior approval from either Burtis or Sharbaugh. Kephart was told that Sun's acceptance should be conditioned on its securing a minimum of 25% of the total outstanding shares. When Rosenthal learned from Kephart on the morning of January 16, that Sun's minimum was 25%, he argued that it was too high a percentage to work to Sun's advantage. Rosenthal felt that many institutions might turn down the

institution with blanks filled in) for signature by the institution at the institution's office at the opening of business on the following morning. Determine whom the representative should ask to see.

3. *Proxy.* A form of proxy will be presented for signature by the institution together with the purchase contract.

4. *Settlement Procedures.* Settlement will be C.O.D. as soon as possible. If institution

willing to settle next day simultaneously with execution of purchase contract, arrange mechanics and form of payment (check, wire transfer, other). If settlement is not first thing in morning make arrangements to discuss details the next morning. Signature guarantees on stock powers will be required where appropriate.

opportunity if Sun's acceptance were conditioned on its obtaining 25%, and he urged a 20% minimum. Kephart called Burtis and related Rosenthal's concerns to him, and Burtis agreed to the lower percentage.

On the morning of January 16, Rosenthal and Lipper went to Lufkin's office and made him the offer. The purchaser was not identified, but Lufkin was told that Dickinson favored the proposition and that the purchaser was a decent company. However, Lufkin learned that Sun was the purchaser and so advised his partner. He volunteered to transmit the proposal to the Madison Fund and that was agreed to. Lufkin told Rosenthal and Lipper that he could discuss only the 93,000 shares owned by the Scarff partnership, Edward L. Scarff & Co. Lufkin called San Francisco and spoke to Scarff and told him of the proposition. The Scarff partnership, Richard Drake, Charles Willock and Robert Smith had been the 4 principals of a kidney dialysis company that BD took over in 1977.[20]

Scarff agreed that the partnership shares should be sold at the $45 price, and promised to get in touch with Willock, Drake and Smith, who lived in Portland, Oregon. He called Willock and Smith and told them he was coming to Portland the next day and that they had the opportunity to dispose of their BD stock at $45 per share. He spoke to Drake the next morning on his arrival in Portland and told him that he could sell his stock for $45 per share and that Sun Oil was the purchaser. He collected the shares of the three, had them sign purchase agreement contracts and sign over their proxies, and then flew to New York to deliver the shares and contracts to Sun.

At noon on January 16, there was a meeting at Salomon of those persons who were to solicit the institutions. In addition to Rosenthal, Gutfreund, Lipper and Zeller, those present were Morris Offit, a Salomon partner, and Pike Sullivan and Joy Gidley

of Eberstadt. A Salomon partner in its Boston office, Joseph Lombard, was tuned into the meeting via telephone. At mid-afternoon, Fogelson, Nathan, and the other lawyers arrived. Each solicitor was given a script and it was dictated over the phone to Lombard. Nathan explained the purpose the script served, and the solicitors were told to specify that only shares held by discretionary accounts were desired. The institutions were then called to determine whether someone would be available after 4:00 P.M. to receive a proposal.

Nilsen of Chemical Fund was called at 3:45, and was offered the proposal before the offer was made to any other institution. Nilsen accepted the $45 price for the two Eberstadt funds, Chemical and Surveyor, and for Eberstadt's discretionary accounts.

At 4:00 P.M. all the persons assigned to do the solicitation met in the trading room of Salomon. Each solicitor had a script from which to read, and a lawyer was teamed up with each caller. Shortly after 4:00 P.M. the telephoning began. Some 30 institutions were contacted.[21] The following institutions accepted the offer and sold their BD shares at $45 per share: American Security and Trust Co. sold 180,700 shares, Bank of America in California sold 143,400 shares, First National Bank of Boston sold 778,731 shares, First Wisconsin Trust Co. sold 96,625 shares, Hartford Fire Insurance Co. in Connecticut sold 99,300 shares, Home Indemnity Co. sold 10,000 shares, Home Insurance Company sold 28,600 shares, Investors Mutual Fund of Minnesota sold 200,000 shares, Investors Variable Fund of Minnesota sold 250,000 shares, Lincoln First Bank of Rochester sold 127,200 shares, Madison Fund sold 135,000 shares, Massachusetts Investors Growth Stock Fund sold 100,000 shares, Central Pension Fund of Massachusetts sold 15,000 shares, Seaboard Surety Co. sold 15,000 shares, State Street Research and Management Corp. of Massachusetts sold 508,300 shares, T. Rowe Price

20. In that transaction Willock received 46,248 BD shares, the other 2 individuals received 140,148 BD shares and Scarff 93,000 BD shares.

21. Unless otherwise indicated, the institution is located in New York, New York.

Growth Stock Fund of Maryland sold 461,000 shares, T. Rowe Price New Era Fund of Maryland sold 68,000 shares, T. Rowe Price Investment Counsel Account of Maryland sold 672,612 shares, Travellers Fund A for Variable Annuities of Connecticut sold 35,000 shares, the Massachusetts Fund sold 35,000 shares, Union Bank of California sold 1,100 shares, and the State of Wisconsin Investment Board sold 413,700 shares.

The following rejected the offer for various reasons: United States Trust Co. held 38,930 shares, North Carolina National Bank held 129,800 shares, Bankers Trust Co. held 394,880 shares, First National Bank of Chicago held 2,000 shares, First National Bank of Minneapolis held 2,000 shares. Morgan Guaranty Trust Co. was one of the institutions alerted to have someone available at 4:00 P.M., but it manifested no interest unless the offer was available to all of its accounts.

The calls from Boston were made only to the Massachusetts institutions, but the calls from Salomon's office in New York were made to cities throughout the United States.

The callers followed the script. There were slight variations, but each solicitee was told that a non-disclosed purchaser, sometimes identified as in the top fifty of Fortune Magazine's 500, was looking for 20% of BD stock; that no transaction would be final unless 20% of the shares were acquired; that the $45 option was a top final price and the $40 option could be accepted with protection in the event shares were later bought at a higher figure; and that the desired 20% goal was within reach or that the order was filling up fast and a hurried response was essential. Each solicitee was asked to respond within one hour or less, although some were given until the next day. Sun was identified to a few institutions, but to most the purchaser's specific identity was not revealed.

The institutions solicited had to consult with their in-house officials hurriedly. By 4:45 Kephart advised Burtis that verbal commitments for 3.1 million shares had been obtained. At 5:35 P.M. the total had reached 20%, and Kephart was given authorization to seal the bargain with these institutions that had committed their shares. Those institutions were called again, and Kephart was put on the phone. He identified himself, and after confirming that the solicitees were interested in selling at $45 a share, he accepted on behalf of Sun's subsidiary L.H.I.W. The project had gone so well that Kephart was concerned that the total might far exceed 34%, and he called Sharbaugh and asked whether he was to pro rate the shares if the 34% figure was exceeded. Sharbaugh replied that there would be no problem unless the figure was over 50%. Before retiring for the night on January 16, Sun officials knew that they had obtained their objective in that there were verbal commitments for at least 30% of BD's outstanding shares. Indeed, there was some concern that they might have overreached their goal by a wide margin.

On January 17 and 18, couriers were dispatched all over the country with Sun's checks to pay for the stock, to obtain signatures or collect prepared purchase agreements, to take physical possession of the stock certificates and to have the solicitees sign powers of attorney to allow Sun to vote their proxies.

Success had been achieved, but the lawyers were now concerned that the legal risks of the transaction were not entirely past. The solicitors had been in communication with a goodly number of individuals. To a few of these, Sun had been identified, and the solicitees had consulted with others in their organization to determine the institution's reaction to the offer. Thus, there was the likelihood that the transaction had already been traced to Sun, and the news would spread. Sun wanted to have physical possession of the stock certificates it had purchased before its identity was generally revealed. Blum feared that verbal commitments were not binding. The lawyers debated whether it was wiser to adopt a wait and see approach and react to the unfolding events or to seek to halt trading in BD stock on the NYSE. Fogelson and Nathan wanted trading halted.

The latter course was approved, but Sun executives forbade disclosure of Sun's identity to NYSE officials. At 9:20 on the morning of January 17, Fogelson called the NYSE and spoke to Richard Grasso, vice president for corporate services. Fogelson identified himself as a "partner of Wachtell, Lipton," said that "a client would be making a Williams Act filing with respect to [BD] by approximately noon the next day," and asked that trading be halted in BD (Tr. 432). Grasso asked Fogelson to identify the client and reveal the purpose of the Williams Act filing, but Fogelson refused to give that information. Grasso told him that the NYSE could not order a halt in trading without further data. Some 15 minutes later Grasso received a second call from Fogelson. The latter said that rumors had come to his attention concerning BD. He repeated his earlier statement about a Williams Act filing the next day and requested that Grasso reconsider his trading halt request. Again Grasso asked Fogelson to identify the client and the nature of the Williams Act filing, and again Fogelson refused to provide the requested response. Grasso said trading could not be halted without further information and that he would have to communicate with BD. Fogelson suggested that he could confirm the rumors by speaking to Rosenthal, and Grasso said he would call him. Grasso then called Rosenthal and told the latter that the information Fogelson supplied him with was insufficient to warrant a halt in trading. Rosenthal said that there would be a material development announced upon the Williams Act filing and recommended that trading be halted.

Grasso reported the substance of the telephone conversations to the floor governor. Grasso again called Rosenthal, this time from the trading floor, and requested that he be given additional information. Rosenthal gave no additional information but repeated his request that trading be halted pending announcement of a Williams Act filing. Rosenthal told Grasso that "he and [the] senior partners in his firm were staking their credibility on the request that in fact a material development would be an-

nounced and therefore their recommendation was that we not trade in the stock" (Tr. 440). Rosenthal named Gutfreund and Salomon as the senior partners to whom he was referring. Grasso talked to the floor manager again, and the opening in trading was delayed. Trading in BD was officially halted at about 10:40 A.M. At 11:00 A.M., Leonard Quigley representing BD called Grasso to ascertain the reason for the halt in trading. BD at first wanted the trading halt lifted but then acquiesced, and on January 19 it requested the trading halt remain in effect. The halt continued until January 23.

Instead of the next day as promised, Sun's Williams Act filing did not take place until January 19 when its 13(d) was filed. Jerome Lipper, after discussion with his partner and Fogelson, advised Dickinson and Turner to file 13(d) statements. The statements were prepared and filed on January 19, the same day Sun's statements were filed. Dunning made a 13(d) filing on January 24.

*Post Transaction Facts and Issues*

When BD learned of the acquisition, it undertook a major lobbying effort through Congressional and New Jersey state officials and the media to have the Commission and/or the state investigate or bring suit against Sun. Members of Congress wrote to the Commission at BD's request urging an inquiry. The Commission's investigation began almost as soon as Sun's identity became known through its 13(d) filing and was underway before any communication urging it to do so was received from any public official, state or federal.

Defendants allege, but the Commission denies, that one of its staff lawyers insisted on talking to Lipper even though advised that Lipper had retained counsel. Lipper never spoke to any Commission official, however, except with his attorney present. The Commission also removed some documents from Eberstadt's file without first notifying its lawyers. It made a similar attempt at Salomon, but did not obtain any papers until agreement was reached with

counsel. The Commission commenced this proceeding prior to a written submission being made to it by Cleary, Gottlieb, defendants' counsel. The Commission stated that it was prepared to produce for private plaintiffs various of defendants' submissions. On defendants' objection, the matter was deferred. Pursuant to an agreement among counsel to attempt to complete discovery by the end of the summer and ready the case for trial in November, agreement was reached on this issue. Defendants assert that the Commission, in a wrongful exercise of executive privilege, barred their access to various documents. This matter was not, as were a number of other pre-trial discovery questions, brought to the court's attention during the pre-trial proceeding.

*Zeller, Eberstadt, M & D and The Chemical and Surveyor Funds*

Zeller, chief executive officer of Eberstadt and vice chairman of M & D, is chairman of the board of the Chemical Fund and vice chairman of the board of the Surveyor Funds. Robert Porter, vice chairman of Eberstadt and chairman of M & D, is chief executive officer of both Chemical and Surveyor Funds. Clifford Nilsen, vice president of Eberstadt and M & D, is vice president for investments of the Chemical Fund and an inside director of the Surveyor Fund. Robert Newton, a vice president of Eberstadt and executive vice president of M & D, is vice president of both Chemical Fund and Surveyor Fund.

M & D, as manager and adviser of both Chemical and Surveyor Funds, is paid a management fee and receives a commission on sales of the funds' shares. The latter funds are open end investment companies registered with the Commission under the Investment Company Act of 1940.

Eberstadt has a policy and operating committee ("P & O") composed of members of the executive committee (Zeller, Porter, Sullivan, Gelis, Dievler), and other members of the board (Wastrum, Schiefferdecker, Nilsen, Newton, Ward). It meets 3 or 4 times a week. All Eberstadt personnel are on the payroll of M & D, but Eberstadt reimburses M & D for the salaries of those who do not spend all their time on M & D affairs. In such cases M & D pays only a portion of the salary. Eberstadt offices are those of M & D and of the two funds in question.

A majority of the directors of the two funds have no relationship with Eberstadt or M & D and may properly be classified as disinterested or unaffiliated directors within the meaning of Sections 2(a)(3), 2(a)(19), 10(a) and 10(b) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a–2(a)(3), 80a–2(a)(19), 80a–10(a) and 80a–10(b).[22] In another connection, the disinterested directors

---

22. 15 U.S.C. § 80a–2(a)(3) provides:

" 'Affiliated person' of another person means (A) any person directly or indirectly owning, controlling, or holding with power to vote, 5 per centum or more of the outstanding voting securities of such other person; (B) any person 5 per centum or more of whose outstanding voting securities are directly or indirectly owned, controlled, or held with power to vote, by such other person; (C) any person directly or indirectly controlling, controlled by, or under common control with, such other person; (D) any officer, director, partner, copartner, or employee of such other person; (E) if such other person is an investment company, any investment adviser thereof or any member of an advisory board thereof; and (F) if such other person is an unincorporated investment company not having a board of directors, the depositor thereof."

15 U.S.C. § 80a–2(a)(19) provides:

" 'Interested person' of another person means—

(A) when used with respect to an investment company—

(i) any affiliated person of such company,

(ii) any member of the immediate family of any natural person who is an affiliated person of such company,

(iii) any interested person of any investment adviser of or principal underwriter for such company,

(iv) any person or partner or employee of any person who at any time since the beginning of the last two fiscal years of such company has acted as legal counsel for such company,

(v) any broker or dealer registered under the Securities Exchange Act of 1934 or any affiliated person of such a broker or dealer, and

(vi) any natural person whom the Commission by order shall have determined to be an interested person by reason of having had, at any time since the beginning of the last two fiscal years of such company, a material

of the Chemical Fund have been described by the court as "men of repute in academia, business and the professions." *See Tannenbaum v. Zeller*, 399 F.Supp. 945, 947 (S.D.N.Y.1975). The disinterested directors of the Surveyor Fund warrant a similar designation. The directors are compensated by the fund they serve and that remuneration, depending upon the burdens carried, ranges from $6,500 to $12,500 per annum. The board meets 6 times a year. Each has a portfolio committee which meets monthly to consider M & D's investment advice, and M & D controls and votes the funds' proxies in any company in which the funds have holdings.

The general procedure is that an investment suggestion originates with M & D and

business or professional relationship with such company or with the principal executive officer of such company or with any other investment company having the same investment adviser or principal underwriter or with the principal executive officer of such other investment company:

*Provided*, That no person shall be deemed to be an interested person of an investment company solely by reason of (aa) his being a member of its board of directors or advisory board or an owner of its securities, or (bb) his membership in the immediate family of any person specified in clause (aa) of this proviso; and

(B) when used with respect to an investment adviser of or principal underwriter for any investment company—

(i) any affiliated person of such investment adviser or principal underwriter,

(ii) any member of the immediate family of any natural person who is an affiliated person of such investment adviser or principal underwriter,

(iii) any person who knowingly has any direct or indirect beneficial interest in, or who is designated as trustee, executor, or guardian of any legal interest in, any security issued either by such investment adviser or principal underwriter or by a controlling person of such investment adviser or principal underwriter,

(iv) any person or partner or employee of any person who at any time since the beginning of the last two fiscal years of such investment company has acted as legal counsel for such investment adviser or principal underwriter,

(v) any broker or dealer registered under the Securities Exchange Act of 1934 or any affiliated person of such a broker or dealer, and

(vi) any natural person whom the Commissioner by order shall have determined to be an interested person by reason of having had at any time since the beginning of the last two fiscal years of such investment company a material business or professional relationship with such investment adviser or principal underwriter or with the principal executive officer or any controlling person of such investment adviser or principal underwriter.

For the purposes of this paragraph (19), 'member of the immediate family' means any parent, spouse of a parent, child, spouse of a child, spouse, brother, or sister, and includes step and adoptive relationships. The Commission may modify or revoke any order issued under clause (vi) of subparagraph (A) or (B) of this paragraph whenever it finds that such order is no longer consistent with the facts. No order issued pursuant to clause (vi) of subparagraph (A) or (B) of this paragraph shall become effective until at least sixty days after the entry thereof, and no such order shall affect the status of any person for the purposes of this subchapter or for any other purpose for any period prior to the effective date of such order."

15 U.S.C. § 80a–10(a) provides:
"No registered investment company shall have a board of directors more than 60 per centum of the members of which are persons who are interested persons of such registered company."

15 U.S.C. § 80a–10(b) provides:
"No registered investment company shall—

(1) employ as regular broker any director, officer, or employee of such registered company, or any person of which any such director, officer, or employee is an affiliated person, unless a majority of the board of directors of such registered company shall be persons who are not such brokers or affiliated persons of any of such brokers;

(2) use as a principal underwriter of securities issued by it any director, officer, or employee of such registered company or any person of which any such director, officer, or employee is an interested person, unless a majority of the board of directors of such registered company shall be persons who are not such principal underwriters or interested persons of any of such principal underwriters; or

(3) have as director, officer, or employee any investment banker, or any affiliated person of an investment banker, unless a majority of the board of directors of such registered company shall be persons who are not investment bankers or affiliated persons of any investment banker. For the purposes of this paragraph, a person shall not be deemed an affiliated person of an investment banker solely by reason of the fact that he is an affiliated person of a company of the character described in section 80a–12(d)(3)(A), (B) of this title."

is presented to the portfolio committee of the fund. Whatever action the Committee takes is written up in its minutes and distributed to the entire board, and these minutes are reviewed at the next meeting of the full board. Between meetings of the portfolio committee, M & D may undertake a transaction if approved by a majority of the disinterested members of the portfolio committee. If such a majority is not accessible, the consent of other disinterested directors is sought. Sometimes an investment is made by M & D without committee or board approval, and such approval is subsequently secured.

As stated above, Eberstadt has had a long and continuing relationship with BD. In 1975, Zeller began the first effort to interest major companies in acquiring a position in BD. He tried to interest Kodak, Procter & Gamble and Merck, without success.

Zeller reported regularly to the Eberstadt P & O committee on the progress being made in the various discussions regarding the acquisition of Dickinson's stock. In October he tried out the most favored nation clause on Nilsen and obtained a favorable response, and in January when the matter crystalized in the Sun proposal he discussed the specifics with Nilsen. He testified that he wanted to obtain Nilsen's reaction. Throughout, Eberstadt personnel were kept fully abreast of what was going on. On January 11 or 12 when Zeller returned from Radnor, he reported to Nilsen that he thought they had made real progress and that Sun was likely to allow them to go forward. He told Nilsen that he should get started clearing the transactions with the two funds without disclosing Sun's name to the directors and without mentioning that BD stock was involved. It was understood, however, that if a director indicated a need for that information to make a decision, Nilsen could reveal it. In addition Nilsen could tell them that a healthy premium was being offered, that Eberstadt and Salomon were acting as investment bankers and advisers to the purchasers, and that Eberstadt would earn a fee. Zeller also told Schiefferdecker, who was in charge of Eberstadt's discretionary accounts (some of which held BD stock), to coordinate through Nilsen the selling of BD stock in the accounts. In this regard, Schiefferdecker was warned not to sell from the one discretionary account maintained by a New Jersey resident.

Nilsen made contact with Chemical Fund directors and told them that Eberstadt and Salomon had been asked by an unnamed client to obtain a significant amount of stock in an unnamed company for the purpose of diversification; that Chemical owned a substantial block of this stock; that a decision would probably be reached before the next meeting of the portfolio committee or the board; and that the stock would be sold at a substantial premium over market price and would result in an attractive profit for Chemical Fund. No mention was made of Eberstadt's or Zeller's role in the transaction. Each director gave his approval. Harvey Mole, another disinterested director, testified that Nilsen revealed both the name of the stock and price options after his persistent questioning. Nilsen's recollection is that he was asked by Mr. Mole to divulge the name of the purchaser, but he refused (Tr. 2206).

John Martin, an unaffiliated director, was asked by the court to give his rationale for considering it an exercise of independent judgment to be asked to give his approval for the sale of an unidentified stock in the fund's portfolio to an unknown purchaser, without his even knowing the price being offered (except that the fund was receiving a substantial premium for the security). Mr. Martin replied "I relied heavily on the M & D organization. They are professionals. They have the highest integrity. I have never had reason to doubt their judgment. They do a thorough job of analysis and research. They do not enter into recommendations lightly. Under the circumstances, I have the highest regard for Mr. Nilsen and his judgment, and I rely heavily on his considered judgment, analysis and assurance on which to base my decision, which was really a concurrence of his judgment" (Tr. 2222–2223).

Newton called the Surveyor Fund directors and sought their approval in a similar fashion, without identifying the stock or the purchaser. All the directors contacted approved. This was the first time the directors of either fund had been asked to approve a sale of a portfolio security on a blind basis (Tr. 2208).

Porter talked to Roger Murray, probably the director of Chemical Fund most knowledgeable in the securities field, about the sale of BD securities on January 11 while they were both in St. Croix attending a meeting of the Investment Company Institute. Porter gave the name of the stock to Murray. Murray had long made evident his dissatisfaction with BD's performance on the stock exchange and had urged that the fund's BD holdings be sold. He had made clear to his fellow board members his negative views on BD, and, prior to 1978, had liquidated BD holdings in any portfolio over which he had final responsibility. Porter asked for Murray's reaction to sale of the BD holdings of both funds at $40, with the possibility of participating in a higher price if one was offered to other shareholders, as opposed to a no recourse final sale at $45. Murray immediately approved accepting the offer at the $45 figure.

During the acquisition labors that Salomon and Eberstadt undertook, Zeller admits that he had heard Lipper state to officials of the various companies they were attempting to interest in a takeover of BD that Chemical Fund's BD shares would be available at the right price and that it was a bellwether institution. Lipper concedes that Chemical Fund was so described with Zeller present at least to Avon, Monsanto and Sun. Zeller states that on all occasions he made clear that he could not speak for the Chemical Fund and there is support for that in the record, but the officials to whom the disclaimer was made were also left with the impression that Chemical Fund shares were available. There is also credible testimony that Zeller expressly indicated that Chemical Fund shares were a part of the package that Lipper proffered as available for sale.

On January 6, at Blum's insistence, Zeller called West to obtain the opinion of counsel that there were no problems under the Investment Company Act of 1940 regarding Eberstadt's and Chemical Fund's connection with this transaction. Zeller outlined the transaction without identifying the stock or the prospective purchaser. He told West that he and Salomon were acting as joint advisors to a company that might purchase "a very substantial amount of stock in a series of private transactions," and that large shareholders such as Chemical Fund would be approached. He believes he mentioned Surveyor Fund also while asking whether, in view of the fact that Eberstadt would be paid, the sale of Chemical's and Surveyor's shares would create any problems under the Investment Company Act of 1940. He told West that the two concerns, Salomon and Eberstadt, would get a flat fee if the transaction went through. West said he would think about it, and asked whether he was clear on the Williams Act. Zeller replied that Wachtell, Lipton was advising Salomon and Eberstadt on that (Tr. 2294–2296). West sent the Chemical Fund an opinion letter dated January 13, 1978, stating that it would not be a violation of the Investment Company Act for the fund to sell its shares and that since Eberstadt and Salomon were "acting as agents to the purchaser" pursuant to § 17(e)(1) of the Act, Eberstadt should reimburse Chemical for the part of its fee that could be attributable to the sale of Chemical Fund stock. A similar letter was sent to Surveyor Fund on January 30, 1978. By this time the identity of the purchaser was no longer a secret, and in the Surveyor Fund letter West cited a January 16, 1978 agreement between Eberstadt and Sun, pursuant to which Eberstadt agreed to advise and assist Sun in connection with the anticipated purchases of the BD stock and to render financial advisory and investment banking services.

### III

Determination

*Threshold Considerations*

Before considering the specific assertions of the parties, several broad threshold is-

sues must be disposed of. Defendants contend that BD lacks standing because it is not an intended beneficiary of the Williams Act and that the individual and class plaintiffs lack standing because they are not parties who were confronted with a decision as to whether or not to sell their shares. For both conclusions they rely on *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977). They question plaintiffs' reliance on *GAF v. Milstein,* 453 F.2d 709 (2d Cir. 1971), *cert. denied,* 406 U.S. 910, 92 S.Ct. 1614, 31 L.Ed.2d 821 (1972), and *Scott v. Multi-Amp Corp.,* 386 F.Supp. 44 (D.N.J.1974), as supporting standing to assert a Section 14 claim because those decisions concerned Section 13(d) issues. Three other cases relied upon by plaintiffs, *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937 (2d Cir. 1969); *Petersen v. Federated Development Co.,* 387 F.Supp. 355 (S.D.N.Y.1974) (Bonsal, J.); and *Smallwood v. Pearl Brewing Co.,* 489 F.2d 579 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974), are said to give no support to plaintiffs' 14(d) thesis because they deal with the standing of shareholder plaintiffs to whom a tender offer was actually made and who, therefore, were actually confronted with a decision whether or not to accept the offer. Since such shareholders are admittedly the especial beneficiaries of the Act, defendants do not question their right to litigate Section 14(d) claims. Defendants contend that the only case relied upon by plaintiffs that is squarely on point is *Dyer v. Eastern Trust and Banking Co.,* 336 F.Supp. 890 (D.Me.1971), and since it predated *Chris-Craft,* they argue that it has no precedential value. In short, defendants urge that *Chris-Craft* must be read as a broad rejection of much of the federal security case law that predated it. Under this broad rubric, only the Commission has standing in this litigation, but because of certain asserted affirmative defenses, defendants argue that even the Commission itself must be disqualified from litigating the enforcement proceeding.

 While it now seems clear that a target company such as BD lacks standing to bring a damage action against a purchaser of its stock in a takeover or partial takeover transaction for violations of Sections 14(d) and 14(e) of the Williams Act, *Chris-Craft* specifically states that its holding is to be read narrowly. The Court said:

> Our holding is a limited one. Whether shareholder-offerees, the class protected by § 14(e), have an implied cause of action under § 14(e) is not before us, and we intimate no view on the matter. Nor is the target corporation's standing to sue an issue in this case. We hold only that a tender offeror, suing in its capacity as a takeover bidder, does not have standing to sue for damages under § 14(e).

*Piper v. Chris-Craft Industries, supra,* 430 U.S. at 42 n. 28, 97 S.Ct. at 949. Moreover, in the text of the opinion on the same page the Court cites Judge Friendly's observation in *Electronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 947, that the period prior to consummation of the proposed transaction "is the time when relief can best be given." While the Court's reasoning forecloses a damage suit by BD, and supports an equitable remedy before the takeover or partial takeover has been effectuated, *Chris-Craft* does not deny standing to the target corporation to seek equitable relief after the transaction has been consummated. No other decision cited to the court or found by the court itself holds that a target company may not seek post-acquisition equitable relief. As BD has pointed out, standing in this regard was assumed in *Kennecott Copper Corp. v. Curtis-Wright Corp.,* 584 F.2d 1195 (2d Cir. 1978), and the most recent decision by this court in the field, *Brascan Ltd. v. Edper Equities Ltd.,* 477 F.Supp. 773, (S.D.N.Y. 1979) (Leval, J.), operates on the same assumption. Defendants cite a statement in *Crane Co. v. American Standard, Inc.,* 439 F.Supp. 945, 953–54 (S.D.N.Y.1977) (Ward, J.), that *Chris-Craft* must be viewed as a part of a trend of narrowing and circumscribing plaintiffs' rights under the federal securities laws. Yet, Judge Ward nowhere suggests that every pre-*Chris-Craft* case favorable to a plaintiff has

been stripped of precedential value. Indeed, on the contrary, the *Crane* case construes *Chris-Craft* as emphasizing that "a private right of action should be implied where necessary to protect public investors." *Id.* at 951. Accordingly, I hold that BD has standing to seek equitable relief under the circumstances of this case. Indeed, it appears from the manner in which the acquisition was secured that one of Sun's primary objectives was to conclude its maneuver swiftly and secretly enough to prevent BD from seeking relief before the transaction had been consummated when a preliminary injunction might have had a meaningful effect. It would be drastic indeed to hold that Sun's tactics have successfully deprived BD of standing to seek a post-transaction equitable remedy as well.

Defendants' second contention, that only those shareholders confronted with a tender offer have standing to sue, also has no merit. While Chief Justice Burger stated that "the sole purpose of the Williams Act was the protection of investors who are confronted with a tender offer," *Piper v. Chris-Craft Industries, supra,* 430 U.S. at 35, 97 S.Ct. at 946, that statement must be read in context. He was making a broad distinction between public investors who were the intended beneficiaries of the Williams Act, and tender offeror contestants whom the Williams Act was designed to regulate.

■ At another place in the opinion, the Court states that the class the Williams Act sought to protect "are the shareholders of the *target* corporation . . ." (emphasis in original). *Id.* at 39, 97 S.Ct. at 948. The Court was not faced in *Chris-Craft,* as here, with shareholders of the target corporation who were not given the opportunity to decide whether to tender because they were deliberately bypassed. Moreover, to limit standing only to those to whom an offer was actually made is a clear misreading of the statute. The underlying purposes were to give protection to shareholders in shifts of corporate control, to require prior disclosure if the shift occurred through a tender offer, and to require a

post acquisition 13(d) filing if the shift occurred otherwise. All shareholders of the target are within the class the Act was designed to protect.

■ It was held in *Dyer v. Eastern Trust and Banking Co., supra,* that both those who tendered their shares and those who did not tender have standing to sue under Section 14, and the court believes that holding to be sound. To the same effect *see Smallwood v. Pearl Brewing Co., supra; Spielman v. General Host Corp.,* 402 F.Supp. 190, 192 n.2 (S.D.N.Y.1975) (Weinfeld, J.), *aff'd,* 538 F.2d 39 (2d Cir. 1976); *Petersen v. Federated Development Co., supra.* Under the circumstances of this case, where an offer to purchase was made only to a select group of shareholders, it would certainly defeat the purpose of the Act to deny standing to the shareholders to whom an offer to purchase was not made. Accordingly, I hold that both the class and individual plaintiffs have standing to bring an action for Section 14(d) and 14(e) violations. In addition, there is no doubt that the target corporation and shareholders have standing to contest violations of Section 13(d). *Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *GAF Corp. v. Milstein, supra.*

■ The next threshold inquiry concerns whether this was a privately negotiated transaction or series of such transactions or a public offering. There can be no disagreement that a purely private transaction is not subject to the pre-filing strictures under Section 14. Senator Williams, in stating the purpose of his proposed amendments, recognized that "[t]he essential problem in transfers of control resulting from cash tender offers or open market or privately negotiated purchases is that persons seeking control in these ways are able to operate in almost complete secrecy concerning their intentions, their commitments and even their identities." 113 Cong.Rec. 855 (1967). He recognized that a privately negotiated purchase may "relate to shifts in corporate control of which investors should be aware," *id.* at 856, and accepted the fact that a valid case could be made for requir-

ing, as with a tender offer, that relevant information be filed before the securities are acquired. Nevertheless, Senator Williams concluded that requiring disclosure only after the privately negotiated or substantial open market transaction has been consummated "avoids upsetting the free and open auction market where buyer and seller normally do not disclose the extent of their interest and avoids prematurely disclosing the terms of privately negotiated transactions." *Ibid.* These activities are covered by Section 13(d) when 5% of a company's shares are acquired.

Although the difference between a privately negotiated transaction and a tender offer was alluded to on several occasions in the course of the debate on the Williams Act, *see e. g.* statement of Manuel F. Cohen, Chairman of the Commission, *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 Before The Subcomm. on Securities of the Comm. on Banking and Currency,* 90th Cong., 1st Sess. 36 (1967); *Takeover Bids: Hearings on H.R. 14475 and S. 510 Before the Subcomm. on Commerce and Finance of the Comm. on Interstate and Foreign Commerce,* 90th Cong., 2d Sess. 14 (1968), the distinction was never articulated. As Judge Frankel said in *Heine v. The Signal Companies, Inc.,* [1976–77] C.C.H.Fed.Sec.L. Rep. ¶ 95,898 at 91, 320 (S.D.N.Y.1977), the "exact line of demarcation between a privately negotiated transaction and a public tender offer has not been . . . identified." Our first responsibility is therefore to distinguish a privately negotiated transaction, which is outside the scope of Section 14 of the Williams Act, from a public transaction, which may not be. While no differentiation between private and public has been spelled out in the Williams Act or the debates leading to its enactment, we have not been cast totally adrift. Some guidelines developed in defining a private offering exemption under Section 4(1) of the Securities Act of 1933, 15 U.S.C. § 77d(1), should be of aid in determining whether this transaction may properly be classified as one privately negotiated or publicly offered.

Arms-length negotiations between two persons epitomize a private transaction. As the number of actors increases, the identifiable characteristics of a private activity become blurred. "To determine the distinction between 'public' and 'private' in any particular context, it is essential to examine the circumstances under which the distinction is sought to be established and to consider the purposes sought to be achieved by such distinction." *S.E.C. v. Sunbeam Gold Mines Co.,* 95 F.2d 699, 701 (9th Cir. 1938), quoted with approval in *S.E.C. v. Ralston Purina Co.,* 346 U.S. 119, 124, 73 S.Ct. 981, 984, 97 L.Ed. 1494 (1953).

In the latter case, the Court held that the proper way to interpret the private offering exemption provided under Section 4(1) of the Securities Act of 1933, was in the light of the statutory purpose. "Since exempt transactions are those as to which 'there is no practical need for * * * [the bill's] application,' the applicability of § 4(1) should turn on whether the particular class of persons affected need the protection of the Act. An offering to those who are shown to be able to fend for themselves is a transaction 'not involving any public offering.'" *S.E.C. v. Ralston Purina Co., supra,* 346 U.S. at 125, 73 S.Ct. at 984. The Court held that the statute applied to a public offering whether "few or many," and while it concluded the Commission could rightfully use a "numerical test in deciding when to investigate particular exemption claims," *ibid,* the Court did not favor embellishing the statute with the addition of a quantitative test as a means for defining a private offering. Finally, the Court stated that those claiming the private offering exemption properly have the burden of persuasion.

■ It must be conceded, of course, that *Ralston Purina* was concerned with the meaning of a private offering exemption under the 1933 Act, and we are faced with an entirely different statutory provision in the case at hand. Yet logic does make its demands. If statutory purpose gives proper definitional aid in distinguishing a public

from a private offering under the 1933 Act, it would seem to follow that the purposes of the Williams Act would help define the contours of privately negotiated transactions exempted from the reach of Section 14.

 Gloss has been added by case law developments since *Ralston Purina.* The number and relationship of the offers and the size and manner of the offering are all relevant in determining whether an offering qualifies for private exemption under the 1933 Act. *See Doran v. Petroleum Management Corp.,* 545 F.2d 893, 900 (5th Cir. 1977). An offering to a "diverse and unrelated group . . . would have the appearance of being public," *Hill York Corp. v. American International Franchises, Inc.,* 448 F.2d 680, 688 (5th Cir. 1971), and each offeree in a private transaction must be afforded the same information that would have been afforded a prospective investor in a public offering, or the offeree must be shown otherwise to have had such information or ready access to it. *Woolf v. Cohn,* 521 F.2d 591, 613 (5th Cir. 1975). Nor does the "high degree of business or legal sophistication" of the offerees suffice to render a transaction private. *Doran v. Petroleum Management Corp., supra,* 545 F.2d at 902. Sophistication is not a substitute for access to the kind of information the 1933 Act requires. *See Hill York Corp. v. American International Franchises, Inc., supra,* 448 F.2d 680, 691. "[T]here must be a sufficient basis of accurate information upon which the sophisticated investor may exercise his skills." *Doran v. Petroleum Management Corp., supra,* 545 F.2d at 903. As in *Ralston Purina,* all the above cases place the burden of persuasion on the party who claims that it should not be subjected to the statute's pinch because the activity engaged in was private in nature. *Accord, United States v. Custer Channel Wing Corp.,* 376 F.2d 675 (4th Cir. 1967); *Garfield v. Strain,* 320 F.2d 116 (10th Cir. 1963); *Gilligan, Wills & Co. v. S.E.C.,* 267 F.2d 461 (2d Cir. 1959). With these guidelines in mind, we now turn to the instant case.

Here, there were face to face transactions with four persons—Dickinson, Dunning, Turner and Lufkin. A total of 39 individuals and institutions were solicited with holdings involving a variety of discretionary accounts. There was no common characteristic binding the solicitees together except that they were uniformly shareholders with substantial BD holdings. Among those approached were highly knowledgeable individuals like Lufkin as well as unsophisticated investors like Smith, Willock and Drake. There were insurance companies, mutual funds, banks, a state entity, partnerships and corporations. The solicitation was nationwide. Some institutions held shares in their own account; others held shares in discretionary and non-discretionary accounts. While the Sun solicitors had been instructed by their lawyers to limit their offer to discretionary accounts, some institutions sold shares in non-discretionary accounts when faced with the demand to respond quickly to the offer lest the opportunity be lost, while others overlooked some of their shares held in discretionary accounts.

Defendants contend that here, unlike *Ralston Purina,* the private nature of the transaction cannot be determined by the solicitees' access to information because the distinction between 13(d) and 14(d) turns not on access to information, but on "which types of acquisition transactions should require prior, and which types subsequent, disclosure." (Defendant's Post Trial Brief on Section 14(d) at 39). They argue that a private offering in the 1933 Act and privately negotiated purchases in the Williams Act are not analogous.

It is true that a private or a public offering of an issuer concerns matters not relevant to considerations which would inform the boundaries separating a tender offer from a privately negotiated transaction. However, the present exercise is not yet an attempt to define a tender offer. Indeed that question need not be reached if what Sun did constituted a "privately negotiated" transaction. In determining the narrow threshold issue under consideration, it is submitted that *Ralston Purina* and cog-

nate cases provide at least some rough guidance.

It should be noted that Senator Williams proposed exempting privately negotiated transactions from Section 14(d)'s pre-acquisition filing requirements to avoid requiring prematurely the disclosure of the terms of such transactions which the parties involved might prefer be kept secret. None of the solicitees involved here had any concern about any premature disclosure. That was solely Sun's anxiety.

██ Since these were undoubtedly not "privately negotiated" transactions in which there was a mutual desire to avoid premature disclosure, the "access to information standard" derived from *Ralston Purina* and its cognate cases becomes even more relevant. The cases indicate that the supposed sophistication of the solicitees will not suffice to render the transaction private if they are given no information on which to exercise their skills. The procedure employed in this case required a hurried response on the basis of little information other than the price offered. The solicitors had no authorization to engage in negotiations with those they called. Their job was to obtain quick, oral commitments.

Plaintiffs argued in summation that the defendants chose from the list of shareholders "the ones they knew, they had done business with, hoped to do business with in the future, people they had reason to believe might not have challenged what they were doing." Defendants agree (Defendants' Post Trial Brief on Section 14(d) at 31). However, it is clear on this record that some solicitees were not previously known to defendants. *Vickers Guide* or some comparable publication was used to identify the institutional holders of BD shares. The information gleaned from these sources, not from Eberstadt or Salomon's private listing, determined who the solicitees were to be.

██ Defendants contend that the factors which decide whether a transaction is a "privately negotiated" purchase are the number of shareholders solicited, the way they are located, the publicity or lack thereof before the purchases are consummated and the procedures by which the sales terms are agreed upon and executed (Brief of Defendants on Section 14(d) at 48). They point to similarities between this transaction and those in *Kennecott Copper Corp. v. Curtiss Wright Corp., supra. Kennecott*, however, does not support defendants' definitional distinctions. The opinion never uses the phrase privately negotiated transaction and never attempts to distinguish a private from a public offering. Moreover, the transactions in *Kennecott* were in large part effectuated on the floor of the Exchange and it is clear that open market purchases are not subject to Section 14's pre-acquisition filing requirements. That certainly was not the case here.

This was a well structured, brilliantly conceived, and well executed project. The acquisition itself commenced Saturday, January 14 with the offer to Dickinson and Turner in confidence. Then Sunday, January 15, Dunning was approached, again with a pledge of confidentiality. On Monday morning, January 16, Lufkin was brought in as an insider. On Monday afternoon before the close of the NYSE, calls were made to institutions around the country believed to possess large holdings in BD stock asking each to have someone available to receive an offer after 4:00 P.M., E.S.T., when the NYSE closes for trading. Some of these institutions had been sent earlier in the week a draft of the substance of the two tiered price agreement to be used (without the actual dollar figures). Shortly after 4:00 P.M., calls were made from Boston to Massachusetts based institutions and from New York to other solicitees around the country offering to purchase from each its holdings of BD stock. The solicitees were not told the name of the purchaser, except that it was in the top 50 of Fortune's 500, and the two tiered price was stated as $45 with no recourse or $40 with protection. The solicitees were told that the offer was contingent on the purchaser securing 20% of all the stock, and each was told that a response must be received within half an hour or an hour, although some were given until the next day. Additional pressure

was placed on some who were told that acceptances were coming in very fast, inferring that the solicitee had better act quickly or be left out.

█ Based on the decided case law distinguishing "public" from "private" transactions, defendants have failed to carry their burden of showing that Sun's acquisition was "privately negotiated." Nor were these agreements a series of separate, independent contracts. This was a single integrated project, planned and executed to secure for Sun some 33⅓% of outstanding BD shares, secretly and quickly so that the acquisition could not be aborted or halted at mid-point by legal action or other countermoves by BD. The institutions were solicited on the 4th market which, as I understand it, is the designation given transactions effectuated during the hours when the NYSE is not operating. Except for Turner and Dickinson, the same offer was made to each solicitee. There were no individual features to distinguish one confirmed solicitation from another except that the number of shares held by each institution varied. Nor, of course, is there any contention that these were open market purchases. Accordingly, the transaction fits neither of the traditional exceptions to Section 14.

This is not the end but merely the beginning of the inquiry. The conclusion that this was a public solicitation does not necessarily mean that the pre-acquisition filing requirements of the Williams Act apply. We now proceed to consider that issue.

*Section 14(d) Claims*

The Senate subcommittee introduced its report on the proposed Williams Act with a brief description of a typical tender offer:

The offer normally consists of a bid by an individual or group to buy shares of a company—usually at a price above the market price. Those accepting the offer are said to tender their stock for purchase. The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

S.Rep.No. 550, 90th Cong., 1st Sess. 2 (1967). Thus, the Senate report identified as attrib-

utes of a tender offer a bid, a premium price, tender by the solicitees, and the conditional nature of the buyer's obligation. The House subcommittee's definition of a tender offer was identical to that adopted by its Senate counterpart. H.Rep.No. 1711, 90th Cong., 2d Sess. 2 (1968), U.S.Code Cong. & Admin.News 1968, p. 2811.

The committee reports reflected statements made during the earlier committee hearings. For example, Commission Chairman, Manuel F. Cohen, had testified that a tender offer typically involved the solicitation by the buyer of options to purchase. The option would only be exercised up to the maximum number of shares desired and would not be exercised at all unless some minimum number of shares had been tendered. *Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearings on S. 510 Before the Subcomm. on Securities of the Comm. on Banking and Currency,* 90th Cong., 1st Sess., 17 (1967). Chairman Cohen further indicated that the buyer usually gave the impression that an immediate response was necessary but did not disclose either what its intentions were with respect to the target company or what the consequences might be for the investor who failed to tender if the acquisition was successful. *Ibid.* Commission General Counsel Phillip Loomis added to this definition his observation that buyers frequently hurried the decision of the solicitees by indicating that shares would be taken up on a first come, first served basis. *Id.* at 207. This general outline of the nature of a tender offer was reiterated by Senator Kuchel, co-sponsor of the Williams Act. *Id.* at 72. Finally, in opening the floor debate on the bill, Senator Williams alluded to many of these same characteristics and added that buyers often hired investment bankers and took out newspaper advertisements to facilitate the transactions. 113 Cong.Rec. 858 (1967).

█ The buyer need not seek one hundred percent or even a majority of the stock of a company in order for its bid to qualify as a tender offer. The Williams

Act was drafted to cover only those tender offers resulting in ownership of more than 10% (now 5%) of the stock of a corporation. Thus, the Act recognizes the possibility that a purchase of even less than 5% might be a tender offer, although exempted from regulation. Senate Report No. 550, *supra* at 9.

A second characteristic common to many tenders but not an essential element of Congress' definition is universal publicity of the offer. Although the Senate recognized that use of a newspaper advertisement was one common tactic in making a tender offer, Senate Hearings, *supra* at 2, it also understood that other means of publicity were sometimes used. For example, the Senate Report refers to offers that are "published or otherwise sent or given to security holders," *id.* at 14, and in response to a question by Senator Williams, Robert Haack, President of the National Association of Securities Dealers, indicated that solicitations were sometimes made by telephone. *Id.* at 107. Indeed, the practice of using newspaper advertisements was apparently a phenomenon of recent origin that developed because the management of target companies had begun to make it difficult for buyers to obtain lists of shareholders which could be used to make direct individual solicitations. *Id.* at 229.

One of the chief concerns of Congress in enacting the Williams Act provisions was to remove the secrecy which had heretofore cloaked transactions involving a shift in corporate control. Defendants concede this purpose but contend that the transaction at issue here requires a post-acquisition Section 13(d) filing rather than a pre-acquisition Section 14(d) filing.

Senator Williams noted in the floor debate that the tender offer provisions were designed to remove the element of secrecy from transfers of control. 113 Cong.Rec. 855. According to the Senate report, no law prior to the Williams Act required that the person seeking control "disclose his identity, the source of his funds, who his associates are, or what he intends to do if he gains control of the corporation." Senate Report No. 550, *supra* at 2. Congress

was also concerned that investors would choose to sell without the information necessary for a reasoned decision for fear that if they failed to tender quickly their shares would not be taken up at all. *Ibid.*

All of these elements—bid, premium price, obligation to purchase all or a specified portion of the tendered shares if certain specified conditions are met (in this instance, if 20% of the outstanding shares are acquired)—are present here. The above definition is set forth in *Kennecott, supra,* 584 F.2d at 1206, a case on which defendants rely as the "definition of a conventional tender offer [that] has received general recognition in the courts" (citations omitted). Defendants also assert, however, that publicity, the widespread solicitation of the general body of shareholders, and placement of the tendered shares in a depository are requisites for a conventional tender offer. However, there is no mention in *Kennecott* of these factors. The court there appeared to be concerned that the position taken by some courts and commentators would create an overlap between open market purchases and tender offers, thereby rendering § 14(d)(5)–(d)(7) unworkable. *See Gulf & Western Industries, Inc. v. Great Atlantic & Pacific Tea Co.,* 356 F.Supp. 1066, 1073–74 (S.D.N.Y.) (Duffy, J.), *aff'd,* 476 F.2d 687 (2d Cir. 1973). But there were open and off-the-market purchases involved in both *Kennecott* and *Gulf & Western Industries,* while there are no open market purchases involved in this case. This was a single cohesive transaction involving face to face transactions with Turner, Dickinson, Lufkin and Dunning, and 4th market telephone communication with institutional holders in which Sun received in hand roughly 6½ million shares and paid out 290 million dollars in about 5 days.

What is probably more important than the fact that this transaction has all the characteristics of a tender offer that were identified by Congress in the debates on consideration of the Williams Act is that Sun's acquisition is infected with the basic evil which Congress sought to cure by enacting the law. This purchase was designed

in intent, purpose and effect to effectuate a transfer of at least a 20% controlling interest in BD to Sun in a swift, masked maneuver. It would surely undermine the remedial purposes of the Act to hold that this secret operation, which in all germane respects meets the accepted definition of a tender offer, is not covered by Section 14(d)'s pre-acquisition filing requirements because Sun's coup was not heralded by widespread publicity and because no shares were placed in a depository. Sun wanted no publicity. It deliberately chose to keep its moves hidden because as Kephart stated, Sun executives were fearful that they might have large sums of corporate funds committed before having in hand shares and proxies representing a 33⅓% controlling interest in BD. Nor did Sun put trust in a depository. It wanted to have physical possession of the stock certificates purchased as quickly as possible.

The argument that the solicitees were sophisticated investors and therefore did not need Section 14 disclosure is no more convincing in this connection than it was in relation to the issue of whether this was merely a private transaction. Sophistication serves no purpose unless it can be applied to the particulars of an investment or sale decision. Therefore, sophistication and expertise cannot be relied on here to exempt this transaction from the reach of Section 14(d). *See* Aronow, Einhorn & Berlstein, *Developments in Tender Offers For Corporate Control* 8 (1977).

The evidence discloses that Turner, Dickinson, Lufkin and Dunning knew that Sun was the purchaser. We may assume that Lufkin told his partner Scarff that Sun was involved. At Chemical Fund, one of the unaffiliated directors, Murray, knew the identity of the purchaser. Another knew the security involved, but none of the other independent directors knew what security they were giving consent to sell or who the purchaser was. They were operating solely on blind faith in Nilsen. While I have no quarrel with such trust, it hardly comports with qualities one would expect in an exercise of independent judgment. Moreover, the Portland contingent—Willock, Smith

and Drake—as far as we can discern on this record, were not informed investors. They relied on and acted on Scarff's word. Scarff told them it was a good deal, had them turn over their stock, sign powers-of-attorney and agreements to sell and headed for the airport en route to New York.

The central thesis of the federal securities laws is that full disclosure is a necessary element of public protection. In *S.E.C. v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 186, 84 S.Ct. 275, 11 L.Ed.2d 237 (1963), while referring to the Securities Act, the Exchange Act, the Investment Company Act and a statute not of concern to us here, the Court said, "A fundamental purpose, common to these statutes, was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." The institutional solicitees approached in this transaction, while for the most part concededly sophisticated and experienced in market transactions, were in no position to put their sophistication and experience to use.

Even if this transaction were not seen as a *conventional* tender offer, it would not necessarily fall outside the ambit of Section 14(d). As discussed above, the concept of a tender offer has never been precisely defined either in the Williams Act itself or by the Commission. Congress left to the Commission the task of providing through its experience concrete meaning to the term. The Commission has not yet created an exact definition, but in this case and in others, it suggests some seven elements as being characteristic of a tender offer: (1) active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) of-

fer open only a limited period of time; (7) offeree subjected to pressure to sell his stock. These characteristics were recently accepted as appropriately describing the nature of a tender offer. *See Hoover v. Fuqua Industries, Inc.,* C. 79–1062A (N.D.Ohio June 11, 1979). In that case, the Commission also had listed an 8th characteristic not included here—whether the public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of large amounts of the target company's securities. The reason this last characteristic was left out undoubtedly was because publicity was not a feature of this transaction.

At any rate, it seems to me that the list of characteristics stressed by the Commission are the qualities that set a tender offer apart from open market purchases, privately negotiated transactions or other kinds of public solicitations. With the exception of publicity, all the characteristics of a tender offer, as that term is understood, are present in this transaction. The absence of one particular factor, however, is not necessarily fatal to the Commission's argument because depending upon the circumstances involved in the particular case, one or more of the above features may be more compelling and determinative than the others.

There was certainly "active and widespread solicitation" involved. Defendants contend that there was no widespread public solicitation of the general body of shareholders. But institutional holdings accounted for roughly 40% of all BD's outstanding shares as of January 16, and there was surely widespread solicitation of this class of shareholders. In addition, there was solicitation of individual shareholders holding a considerable percentage of BD shares. Measured by the size of the holdings solicited (34%), the geographic dimensions of the effort (from New York to California and from Massachusetts to North Carolina) and by the number of solicitees approached (30 institutions and 9 individuals, not including 3 institutions that were approached earlier and either indicated no interest, as did Morgan Guaranty Co., or were forgotten, as was Allendale Insurance Co.), there was

widespread solicitation of BD's shareholders. *See Hoover v. Fuqua Industries, supra; Cattlemen's Investment Co. v. Fears,* 343 F.Supp. 1248, 1251–52 (W.D.Okl.1972).

The second characteristic, substantial percentage, does not move us very far, for unless the solicitation embraces at least 5% of the issuer's stock, the Act would not be called into play. The third element, premium over market, is regarded as one of the typical indicia of a conventional tender offer and was certainly present here. *See Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d at 1206.

The fourth element—the firm terms of the offer and the absence of opportunity for negotiation—is stressed by the Commission. Defendants argue that the solicitees were not told that negotiations were barred, but the price was so attractive that none sought to negotiate. No negotiation took place and indeed if any had occurred, the whole project would have been derailed. It is undisputed that the solicitors could not barter about the terms of the offer. Any desire by a solicitee to deviate from the proffered terms had to be referred to Kephart. He, in turn, had to call Radnor to obtain permission to accept such a variation. That time-consuming process would have slowed the project and increased the legal risk of BD's being able to abort the acquisition. This project was structured so that there would be no individualized negotiations. The hope and expectation were that the price would be so attractive that negotiation would be unnecessary.

The fifth, sixth, and seventh elements were also present. The offer was contingent on Sun's achieving a stated percentage of BD shares—another characteristic of a typical tender offer. *See Kennecott Copper Corp. v. Curtiss-Wright Corp., supra,* 584 F.2d at 1206; *Smallwood v. Pearl Brewing Co., supra,* 489 F.2d at 597 n. 22. Time constraints were placed on each solicitee, and although some were given additional time to respond, most felt that they had to reply within the time constraints imposed. *See Great Western United Corp. v. Kidwell,*

577 F.2d 1256, 1261 n. 2 (5th Cir. 1978), *rev'd on other grounds* —— U.S. ——, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979). The solicitors tried to exert a maximum amount of pressure on the solicitees they contacted. The latter were told that favorable responses were coming in fast, and it was implied that either they had better make a hurried acceptance of this attractive offer or their chance would be gone.

 The one element missing is publicity. Lack of publicity, however, should be no deterrent to classifying this transaction as a tender offer since, as has been stated, a principal objective of the Williams Act was to prevent secret corporate takeovers. Congress intended the Williams Act "to be construed . . . not technically and restrictively, but flexibly to effectuate its remedial purposes," *S.E.C. v. Capital Gains Research Bureau, supra,* 375 U.S. at 195, 84 S.Ct. at 284–85; *S.E.C. v. National Securities, Inc.,* 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), and it has long been the rule that all the federal securities laws must be given a construction which effectuates their remedial objectives. *S.E.C. v. National Securities, Inc., supra; J. I. Case Co. v. Borak,* 377 U.S. 426, 432–33, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); *Corenco Corp. v. Schiavone & Sons, Inc.,* 488 F.2d 207, 216 (2d Cir. 1973); *GAF Corp. v. Milstein, supra,* 453 F.2d at 719–20; *Electronic Specialty Co. v. International Controls Corp., supra,* 409 F.2d at 945–46. While *Piper v. Chris-Craft Industries, Inc., supra,* may have narrowed the presumed scope of the Williams Act in respect to who may claim its protection, particularly in suits for damages, there is nothing in that opinion to indicate a retreat from the long accepted doctrine that the substance of the federal securities laws must be broadly construed. Public investors are the intended beneficiaries of the Williams Act; accordingly, its provisions should be construed to facilitate their coverage.

Defendants contend, in effect, that acceptance of the Commission's characterization of this transaction as a tender offer would offend due process. That argument is devoid of merit in any event, but coming from counsel in this case, it is particularly disingenuous. Throughout the trial and in their post trial briefs defendants have placed heavy emphasis on the high quality of the legal advice which informed this transaction. The record shows that counsel realized that the concept of a tender offer had not been precisely defined, and Sun executives were advised of this lack of certainty in the law. Indeed, a quotation from Martin Lipton illustrates that knowledgeable lawyers, such as defendants' counsel, surely cannot be caught by surprise by a holding that this transaction is a tender offer. In a piece written in 1977, *Open Market Purchases,* 32 Bus.Law 1321 (1977), Lipton noted that "tender offer" was not defined by Congress in drafting the Williams Act, nor by the Commission in adopting implementing rules. The Commission in the proposed new tender offer rules, Securities Act Release No. 5731, August 2, 1976, declined to define "tender offer." "Case law, in defining 'tender offer,' has followed the Williams Act's legislative history, which makes it clear that the Williams Act was not intended to be restricted to conventional tender offers but rather was meant to encompass all methods of takeover by a large-scale stock purchase program."

To the same effect, *see* Aronow, Einhorn & Berlstein, *Developments in Tender Offers For Corporate Control* 1 (1977), where the authors suggest that the absence of a definition apparently was due to the fact that Congress and the Commission believed that, for purposes of the federal regulatory scheme, the term "tender offer" might well encompass transactions yet unborn with characteristics not typical of the transactions then identified in general custom and usage as tender offers. Thus, the question of just what was encompassed by the term "tender offer" was intentionally left open in an effort to preserve the flexibility of both the Commission and the courts in making determinations on a case-by-case basis. Both counsel and Sun executives knew that no court had accepted the simplistic definition now urged by defendants.

■ Sun wanted to achieve a 33% holding without being cut off in mid-stream. The pre-filing requirements of Section 14(d) would have given BD warning and insured its interference with Sun's objective. Defendants' lawyers simply sought to devise a strategy to meet Sun's needs and those of the investment bankers whose fee was contingent on a successful acquisition. The strategy was purposed to avoid the pitfalls which compliance with the Act mandated. There is nothing necessarily wrong with creating a *sui generis* approach to suit the particular needs of a client. But, when knowledgeable lawyers advise their clients to take an action which falls within the periphery of the law's proscriptions, due process considerations do not come into play simply because of miscalculation.

These considerations aside, no constitutional issues are presented. Congress did not define a tender offer or a privately negotiated transaction; that job was left to the Commission which decided to approach the question on a case-by-case basis. It is "constitutionally sufficient if Congress clearly delineates the general policy, the public agency which is to apply it, and the boundaries of this delegated authority. Private rights are protected by access to the courts to test the application of the policy in the light of these legislative declarations." *American Power & Light Co. v. S.E.C.*, 329 U.S. 90, 105, 67 S.Ct. 133, 142, 91 L.Ed. 103 (1946). Moreover, there is no "constitutional requirement that the legislative standards be translated by the Commission into formal and detailed rules of thumb prior to their application to a particular case. If that agency wishes to proceed by the more flexible case-by-case method, the Constitution offers no obstacle." *Id.* at 106, 67 S.Ct. at 143.

■ There are, therefore, no due process constraints barring the court from holding that the Sun transaction was a tender offer within the meaning of the Williams Act. None of the cases in which it was held that there had been no tender offer, *e. g. Kennecott, supra; Brascan, supra,* has all the definitional features that courts have tradition-ally used to describe a tender offer. As noted above, however, the important elements are present here. Accordingly, in acquiring 34% of BD stock in the transaction at issue here, Sun made a tender offer for BD stock without a pre-acquisition filing in violation of Section 14(d) of the Williams Act.

*Section 13(d) Group*

The Williams Act requires the filing of a 13(d) statement with the issuer, the exchange on which the securities are traded and the Commission ten days after a direct or indirect acquisition of beneficial ownership of more than 5% of the issuer's registered securities. Plaintiffs allege that Dickinson and others (who, in combination, were directly or indirectly the beneficial owners of more than 5% of BD) failed to meet Section 13(d)'s requirements despite agreeing to act together regarding the disposition of the securities they held. Defendants contend that no such agreement was made, that no group had been formed and that in any event, the filing of a 13(d) statement is mandated only when an agreement is made to acquire securities. They argue that even if Dickinson and others did act in concert pursuant to pre-arrangements, there is no violation because the group disposed of, rather than acquired, BD securities.

■ This last argument has surface appeal, both because the case law on the question deals largely with acquisitions and because BD management was on notice here that Dickinson was shopping for a takeover ally. However, the statutory language clearly and unambiguously covers the disposition of securities, as well as their acquisition. Where the language is plain and unambiguous, "[t]here is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes. Often these words are sufficient in and of themselves to determine the purpose of the legislation. . . . When that meaning has led to absurd or futile results, however, [the Supreme] Court has looked

beyond the words to the purpose of the Act. Frequently, however, even when the plain meaning did not produce absurd results but merely an unreasonable one, plainly at variance with the policy of the legislation as a whole, [the] Court has followed that purpose, rather than the literal words." *United States v. American Trucking Ass'ns Inc.,* 310 U.S. 534, 543, 60 S.Ct. 1059, 1064, 84 L.Ed. 1345 (1940) (footnotes omitted).

This circuit has stated in *GAF Corp. v. Milstein, supra,* that the purpose of § 13(d) is "to alert the marketplace to every large, rapid aggregation or accumulation of securities, regardless of the technique employed, which might represent a potential shift in corporate control . . . ." Since a combination to dispose of securities could well "represent a potential shift in corporate control" and since the filing requirement "is intended to protect investors and to enable them to receive the facts necessary for informed investment decisions, [i]t should therefore be construed liberally to ensure that its investor protection purpose is given full effect." *Financial General Bankshares, Inc. v. Lance,* [1978] C.C.H.Fed.Sec.L.Rep. ¶ 96,403 at 93,418, 93,424 (D.D.C.1978). Defendants' reliance on this court's opinion in *Sisak v. Wings and Wheels Express, Inc.,* [1970–71] C.C.H.Fed.Sec.L.Rep. ¶ 92,991 (S.D.N.Y.1970) (Frankel, J.), for the proposition that the 13(d) filing requirements do not come into play when the group's purpose is to dispose of rather than acquire shares seems misplaced. Judge Frankel left no doubt that the true import of his holding was that Section 13(d) could not be read to cover a transaction where the so called group consists of a buyer and seller and the "sole aspect of the transaction is to sell all of the securities of one party to another." *Id.* at 90,670. "The word group . . . call[s] to mind alliances of people linked together by identical objectives and not by their placement on opposite sides of a transaction." *Ibid.* One case, *Texasgulf, Inc. v. Canada Development Corp.,* 366 F.Supp. 374 (S.D.Tex.1973), clearly holds that Section 13(d) requirements are triggered when a group having the requisite beneficial interest agrees to acquire or dispose of company stock. The critical ingredient is whether the agreement to dispose of the shares will effectuate a shift in corporate control.

It is clear from the evidence that Dickinson secured the services of Eberstadt and Salomon for the purpose of finding a corporation acceptable to him that would be interested in buying his substantial BD holdings and those of his friends as the foundation for a complete or partial takeover of BD. It is also conclusively established that that purpose had been made definitive and was in active operation through Salomon as early as April 21, 1977. Eberstadt became involved on April 25. Dickinson personally engaged in the effort with AHP, Monsanto and Squibb. Moreover, he kept Dunning abreast of what was going on and the evidence warrants an inference that he and Lipper recruited Lufkin to join the group.

Once Eberstadt joined forces with Salomon, the search for the willing corporation began in earnest, and unsuccessful approaches were made to Avon, American Home Products, Bristol Myers, Pepsico, Monsanto, Hewlett-Packard, Hoffman-La-Roche, Schering-Plough, Squibb and finally Sun. In all of these contacts the corporate officials were assured of Dickinson's and Dunning's willingness to sell and of the availability of ½ million shares of the Chemical Fund.

That figure persists as the number of shares Chemical Fund was willing to make available if a satisfactory arrangement could be made. Sometimes, the corporate executives would be told that Eberstadt had 500,000 shares of BD stock that would be a part of the package, and the logical inference is that Salomon and Eberstadt were attributing to Chemical Fund not only the 413,200 shares in its portfolio, but also the 30,000 shares of Surveyor Fund, and the 52,175 shares held by Eberstadt in discretionary accounts. These figures add up to 495,375 shares held by Eberstadt interests. Although Zeller testified that he always made it clear that he could not speak for Chemical Fund, there is also testimony that he indicated Chemical Fund shares were

included in the initial package of 10–15% of the shares the investment bankers promised could be delivered immediately.

Moreover, the persons who dealt with Zeller and Lipper, despite the former's *pro forma* disclaimer, left the meetings convinced that Chemical Fund's shares were available along with Dickinson's, Dunning's and Lufkin's. Indeed, Lipper would tell the prospective acquisition clients that Chemical Fund was the bellwether of the institutions holding large blocks of BD stock and that it would sell for the right price, implying that the others would follow suit. Zeller would agree to this statement. Throughout the spring, fall and winter of 1977, Dickinson was in frequent communication with Dunning. He advised the corporate officials he solicited that Dunning was as distressed with the current state of affairs at BD as he. When Dickinson was approached by Zeller and Lipper on January 14 to sell his shares to Sun, he insisted that although he thought the proposal a good one, his acceptance was contingent on the offer being made to Dunning as well. He called Dunning from his hospital room and made arrangements for Zeller and Lipper to see him in Baltimore the next day.

On October 27, in a meeting with Shering-Plough, Zeller mentioned the availability of 2,500,000 shares, including 1,200,000 from Dickinson's family, 350,000 from Dunning, 450,000 from Scarff-Lufkin and 500,000 from Chemical (Tr. 2515–20). In November, Lufkin called Dickinson's office while he was out and left a message indicating he wished to see Dickinson. On receipt of the message, Dickinson called back and agreed to a meeting in Lufkin's office in the afternoon of November 10. Dickinson asked Jerome Lipper to accompany him, and the latter asked permission for his brother to go along as well. At the meeting Lufkin indicated that he represented a stock holding that grew out of a BD west coast acquisition and that because of BD's internal difficulties and Dickinson's ouster, he was now concerned about his investment. He wanted to know what was going on because now he had to watch his stock (Tr. 2334–37). Thereafter, in conversations

with corporate executives about buying an interest in BD, Lufkin was always included among the individual holders who could be counted on as willing sellers. In mid-December, when Lipper told Kephart that 15% of BD shares were available for purchase, Lufkin was among those whose shares were counted (Tr. 143–144). Lufkin was afforded the offer to sell on the morning of January 16 and appears to have been given the identity of the purchaser.

Eberstadt had a P & O committee that met 3 or 4 times a week. When Zeller became engaged in the Dickinson effort, the P & O was kept abreast of what was going on. Nilsen who was an executive of both funds, was also a member of the P & O. As to the shares which Eberstadt held in advisory accounts, there is certainly no issue raised about the propriety of counting them toward the 5% holding required by 13(d). Counting only the shares Dickinson held outright and those in the Eberstadt advisory accounts (802,138 + 52,175) beneficial ownership of 854,313 can be accounted for. While Zeller did not personally handle those accounts, the Eberstadt official who did so, Schiefferdecker, was Zeller's subordinate and a member of its P & O committee. He was told to coordinate his response for the advisory accounts through Nilsen when Zeller had already advised Nilsen to poll the directors of the Chemical and Surveyor Funds about the impending Sun offer. Eberstadt's fee of $350,000 was dependent on its successfully delivering to Sun 20% of BD stock. Nilsen, Schiefferdecker and all other Eberstadt people were aware of this. These facts compel an inference that the shares Eberstadt held in its advisory accounts were counted along with Dickinson's as committed to a proposed takeover effort once Zeller became actively engaged in the enterprise.

■■■ Attorneys for Chemical and Surveyor Funds argue that under these funds' binding operating procedures, only the majority of the independent directors could make decisions about the fund shares and that whatever Zeller might have said, he

could not make a decision for the funds absent the vote of their directors. In addition, it is argued that beneficial ownership encompasses an economic interest which Eberstadt surely did not have. For this proposition defendants rely on the interpretation of beneficial ownership under Section 16(a) of the Exchange Act, on the case law defining "beneficial ownership" of a trustee, see *Marquette Cement Mfg. Co. v. Andreas,* 239 F.Supp. 962 (S.D.N.Y.1965) (Cashin, J.), and on a partner's "beneficial ownership" of short swing profits from the partnership's sale of stock in a company of which the partner in question was a director, see *Blau v. Lehman,* 368 U.S. 403, 82 S.Ct. 451, 7 L.Ed.2d 403 (1962). That reasoning is not persuasive. Section 13(d) is concerned with shifts in corporate control, and beneficial ownership in that respect need not relate to economic interest. Rather, a beneficial owner is one with the power to commit the shares to the group purpose of effectuating a shift in corporate control.

It is also contended that there is no evidence that the outside directors who authorized the sale of BD stock were "controlled" by M & D, Zeller, or Eberstadt. Stress is placed on the court's characterization of the outside directors of Chemical Fund as men of repute, *Tannenbaum v. Zeller, supra,* and on the statutory presumption of Section 2(a)(9) of the Investment Company Act, 15 U.S.C. § 80a–2(a)(9), that a natural person is presumed "not to be a controlled person." Nonetheless, that the directors of the two funds are outstanding in their fields is beside the point. The issue here is whether the procedures used to secure their consent to the sale were pro forma or were truly independent of Eberstadt or M & D. As for the statutory citation, the very next sentence in § 2(a)(9), not quoted by defendants, states that "such presumption may be rebutted by evidence . . . ." Hence, there is no substitute for a thorough examination of the particular circumstances of this transaction.

The precise issue is whether plaintiffs have met their burden of persuasion in rebutting the presumption that the outside directors were not controlled by Zeller,

Eberstadt and M & D with respect to the transaction at issue here. *See S.E.C. v. S & P National Corp.,* 360 F.2d 741 (2d Cir. 1961). As a start in the examination of the evidence, it is not inappropriate to quote from the Court of Appeals in *Tannenbaum v. Zeller,* 552 F.2d 402 (2d Cir.), *cert. denied,* 434 U.S. 934, 98 S.Ct. 421, 54 L.Ed.2d 293 (1977), regarding just what genre of institution Chemical and Surveyor Funds are. There the Court said:

> [An open end investment company] mutual fund is a "mere shell," a pool of assets consisting mostly of portfolio securities that belong to the individual investors holding shares in the fund. The management of this asset pool is largely in the hands of an investment adviser, an independent entity which generally organizes the fund and provides it with investment advice, management services, and office space and staff. The adviser either selects or recommends the fund's investments and rate of portfolio turnover, and operates or supervises most of the other phases of the fund's business.
>
> . . . . .
>
> Control of a mutual fund . . . lies largely in the hands of the investment adviser, an external business entity whose primary interest is undeniably the maximization of its own profits.

552 F.2d at 405. Defendants do not appear to dispute the above assessment except that they would state that "the primary goal of a mutual fund is to maximize profits in the interest of the fund's shareholders" (Post Trial Brief of Chemical and Surveyor Funds at 5).

It was evidently standard operating procedure for M & D to make investment recommendations to the funds' portfolio committees. Such recommendations were generally adopted. The evidence in this record discloses that the vote of the outside directors of both funds on the sale of BD stock was obtained by their being individually polled, for the most part by telephone. When Zeller instructed Nilsen to poll the outside directors to obtain their approval to

sell the BD security, he was also instructed not to tell them the names of the purchaser of the stock. Indeed, most directors were not even told what price was being offered. They were given no opportunity to decide whether to take the $45 no recourse option or $40 option with the right to obtain the highest price paid any other shareholder.

Roger Murray, the expert in the securities field, was given the identity of the purchaser, the name of the stock and the two tiered price. Since he was known to have been pressing to unload BD holdings, his assent was assured. One director, although not told, guessed the name of the security, and one of the Chemical and one of the Surveyor Fund directors were purportedly given the name of the stock after insisting upon it. These latter two disclosures are disputed, however, because Nilsen, who polled all the Chemical Fund directors, insists that he refused to give the name of the stock in question. On inquiry, one of the Chemical Fund directors advised the court that his decision to concur without the name of the stock, the identity of the purchaser or the purchase price was based on his high regard for and heavy reliance on Nilsen's considered judgment.

Based on the reality of this transaction, it would indeed be substituting shadow for substance, see United. Gas Improvement Co. v. Continental Oil Co., 381 U.S. 392, 402, 85 S.Ct. 1517, 14 L.Ed.2d 466 (1965), and exalting form over substance, see Byrnes v. Faulkner, Dawkins & Sullivan, 550 F.2d 1303, 1312 (2d Cir. 1977), to hold that Eberstadt and M & D were not the beneficial owners of 495,375 shares of BD stock (constituted by Eberstadt's 52,175 BD shares in advisory accounts, 30,000 shares of the Surveyor Fund and 413,200 shares of the Chemical Fund) for purpose of combining them with other shares to effectuate a shift in corporate control. Similarly, it would be blinking reality to find that Zeller, as chief executive of Eberstadt of which M & D was a subsidiary, was unable to make a binding commitment of those shares as a part of the Dickinson, Lipper, Zeller package from April, 1977 until the Sun transaction was consummated in January, 1978. See S.E.C.

v. Savoy Industries, supra, [1978] C.C.H. Fed.Sec.L.Rep. at 93,870. While I agree that "no amount of enthusiastic advocacy or oratory" can be interpreted to encompass control, Acampora v. Birkland, 220 F.Supp. 527, 543 (D.Colo.1963), far more was involved here than that. Zeller, Nilsen and the rest knew that the assent of the outside directors could be counted on and that the results were foregone. M & D at all times held the proxies to shares in the portfolios of the two funds and could vote those shares.

The clear inference to be drawn is that Dickinson, Eberstadt, M & D, Lufkin and Dunning agreed to pool the shares of which they were beneficial owners and make them available through Salomon and Eberstadt to a corporate purchaser interested in attempting a takeover or partial takeover of BD. The evidence as to Dunning's and Lufkin's participation with Dickinson is not as overwhelming as is that of Eberstadt and M & D, but it nonetheless supports an inference that they were partners in the proceedings. A such, they were all part of a group formed to dispose of their shares to aid a third party acquisition of a controlling interest in BD.

 The formation of a group beneficially owning more than 5% of a class of a security triggers the filing requirements of Section 13(d). GAF Corp. v. Milstein, supra, 453 F.2d at 716–18. Proof of the existence of a group requires a showing of an agreement to act together for a common purpose. See Corenco Corp. v. Schiavone & Sons, Inc., supra, 488 F.2d at 217–18. Although some combination directed towards concerted action must be established, there need be no written agreement. Indeed, a writing evidencing the agreement is unlikely. See Jewelcor Inc. v. Pearlman, 397 F.Supp. 221, 250 (S.D.N.Y.1975) (Stewart, J.). Realistically, it is recognized that to require a written agreement as evidence of the formation of a group within the meaning of Section 13 of the Act would negate the purposes of the Act. Twin Fair v. Reger, 394 F.Supp. 156, 160 (W.D.N.Y.

1975); *Water Wall Associates, Inc. v. American Consumer Industries,* [1973] C.C.H.Fed. Sec.L.Rep. ¶ 93,943 (D.N.J.1973).

■■■■ The existence of the group may be established by "direct or circumstantial evidence to support the inference of a formal or informal agreement or understanding." *S.E.C. v. Savoy Industries, supra,* [1978] C.C.H.Fed.Sec.L.Rep. at 93,870. Both the direct and circumstantial evidence in this case compel the conclusion that as early as April, 1977 Dickinson, Eberstadt and M & D (then holding beneficial ownership of more than 5% of BD stock) had reached a common understanding to take concerted action to find a purchaser for their shares as a part of an effort to effectuate a shift in corporate control of BD. When Dickinson, Lipper and Eberstadt dealt with LaPorte of AHP, part of the package was that Dickinson would become chairman. There is no further mention of this, but it is clear that Dickinson and Eberstadt had agreed to use BD shares under their control as a package to help induce a third-party takeover or partial takeover of BD. Lufkin and Dunning committed themselves to this endeavor sometime later. When the common understanding was arrived at by those who in combination held more than 5% of B.D. stock, the 13(d) requirements came into play. *Texasgulf, Inc. v. Canada Development Corp., supra,* 366 F.Supp. at 403. The statute requires that group participants identify themselves and state their purpose. Rumors of the existence of such a group reached BD management and instigated Flom's calls to Lipton. BD thus knew that Dickinson was shopping around, and although this is of some significance, on balance it does not excuse the failure to comply with Section 13(d)'s statutory mandate.

*Aiding and Abetting Sun's Failure to Comply With Section 14(d) and Aiding and Abetting Dickinson, Eberstadt, M & D and Others in Failing to File a 13(d) Group Statement*

■■■■ Plaintiffs allege that Zeller, Lipper, Salomon and Eberstadt aided and abetted violations of the federal securities laws. The aiding and abetting standard applicable to Commission enforcement proceedings which, with some modification, may have general application is set forth in *S.E.C. v. Management Dynamics, Inc.,* 515 F.2d 801, 811 (2d Cir. 1975), and most recently adhered to in *S.E.C. v. Coven,* 581 F.2d 1020, 1028 (2d Cir. 1978). First, it must be established that a principal, as distinguished from the alleged aider and abettor, has breached the federal securities laws. It has been concluded that Sun has violated § 14(d) and that Dickinson, Eberstadt, M & D, and others violated § 13(d). The next requirement is that the aider and abettor have knowledge of the violation. Finally, the aider and abettor must further or render substantial assistance to the unlawful endeavor. *Rolf v. Blyth Eastman Dillon & Co.,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978); *accord, Rochez Bros., Inc. v. Rhoades,* 527 F.2d 880 (3d Cir. 1975). Scienter is clearly not necessary in an enforcement action brought by the Commission. *S.E.C. v. Coven, supra; S.E.C. v. Savoy Industries, supra* at 93,872–73. Even if it were, there is sufficient evidence to establish scienter here.

■■■■ Lipper, Salomon, Zeller and Eberstadt were aiders and abettors of Sun's violation of Section 14(d), and Lipper, Salomon and Zeller were aiders and abettors of Dickinson's, M & D's, Eberstadt's, and the others' violations of Section 13(d). Lipper, Salomon, Zeller and Eberstadt from at least April 25, 1977, were actively engaged in an effort to find a corporation which would purchase the stock belonging to Dickinson and his allies to effectuate at least a partial takeover of BD. It was recognized that these efforts would not succeed unless the solicitors were able to find a corporation willing to move against hostile management. To maximize the possibility of finding a buyer willing to so move, they devised a plan whereby the acquirer could avoid the pre-acquisition disclosure requirements of the Act and whereby the group could avoid filing the required 13(d) statement. They

worked feverishly for months to find the right purchaser. Lipper, having whetted Kephart's interest, led him to believe that rival corporations were lurking in the wings ready to swallow up BD if Sun did not move swiftly. In addition, Salomon and Eberstadt assisted in meeting Sun's needs by getting commitments for 34% of the shares of BD secretly and speedily.

Defendants seem to contend that Salomon and Lipper cannot be held as aiders and abettors, even if the court holds that Eberstadt and M & D formed a 13(d) group with Dickinson, because Salomon and Lipper, in relying on Zeller's statement as to fund procedures, did not know a group was formed. This argument is transparently weak. Salomon and Eberstadt worked as a team. Salomon knew that Chemical and Surveyor Funds held a sizeable number of BD shares. As defendants have persuasively shown, information regarding the holdings of institutions was readily available in various publications. The firm fully expected these shares to be available for sale if a takeover candidate was found. Lipper concededly referred to Chemical Fund as a bellwether institution that would sell at the right price. Zeller was fully expected to deliver the shares held by Eberstadt's interest. Whenever a new candidate was approached, Lipper and Zeller would somehow make it clear that Eberstadt's holdings in BD, usually identified as 500,000 Chemical Fund shares, were available for sale along with Dickinson's, Dunning's and Lufkin's. Thus, Zeller, Lipper and Salomon aided and abetted the defendants' failure to file a 13(d) statement, and they, Eberstadt and M & D aided and abetted Sun's violation of § 14(d).

■ Finally, defendants cannot escape responsibility for their infringements of the law on the theory of good faith reliance on the advice of counsel. *S.E.C. v. Harwyn Industries Corp.*, 326 F.Supp. 943, 956–57 (S.D.N.Y.1971) (Mansfield, J.). Such reliance does not excuse the infraction, it goes only to the nature of relief. *Arthur Lipper Corp. v. S.E.C.*, 547 F.2d 171, 182 (2d Cir. 1976), *cert. denied*, 434 U.S. 1009, 98 S.Ct. 719, 54 L.Ed.2d 752 (1978); *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082 (2d Cir. 1972).

### Sun's 13(d) Statement

Sun's 13(d) statement was filed on January 19. In the "purpose of the transaction" section, Sun's statement indicates that it purchased its interest in BD to acquire a "significant equity interest" while it evaluates the company and that it is considering seeking additional shares, proposing a merger, or seeking representation on the Board. The statement goes on to state that Sun's current interest constitutes approximately 34.1%; that as such it may account for its interest by the "equity method;" that under New Jersey law and BD's certificate of incorporation, "mergers and certain other business combinations" and amendments to the company's charter of incorporation require a ⅔ affirmative vote of outstanding shares; and that under BD bylaws, a holder of more than 25% may call a special meeting.[23]

---

**23.** In pertinent part, Sun's 13(d) reads as follows:

*Purpose of Transaction.*

Sun desires to diversify its business interests and activities. Based on a review of publicly available information, Sun believes that an equity interest in the Company is consistent with Sun's diversification objectives. The shares specified in Item 5 hereof were purchased to provide Sun with a significant equity interest in the Company while Sun continues its evaluation of the Company and its industry.

Sun intends to continue to study the Company and its industry and to take such action as Sun considers desirable in the light of its evaluation and circumstances then prevailing. Sun is considering, among possible courses of action: (i) seeking to purchase additional Shares in brokerage transactions, in private transactions, in a tender offer or exchange offer, or otherwise; (ii) proposing a merger or other form of combination between Sun or the Subsidiary and the Company; or (iii) seeking representation on the Company's Board of Directors. Sun has not formed an intention with respect to pursuing any of such courses of action. Depending upon the results of Sun's evaluation and circumstances then prevailing, Sun may determine to hold its Shares as an investment or to dispose of all or a portion of such Shares.

Sun was concerned about getting 33⅓% to secure a significant voice in the future course BD would take. Sun depicts itself as only concerned with equity accounting, but its real purpose was to obtain a sufficient foothold in various companies outside the energy field to be able to block attempts by other offerors to establish large positions in the same securities. On February 9, Kephart sent a memorandum to two members of the BD study team assigning them the task of finding how 500–700 million dollars could be marshalled by February 17. Kephart testified that that was the sum it would cost for a 100% takeover of BD. At the February annual meeting Sun voted with BD management to increase authorized shares, but it is hard to credit this as a true indication of Sun's intention.

▮▮▮ It is settled that the filing requirements of Section 13(d) mandate completely truthful statements. *S.E.C. v. Savoy Industries, supra*, at 93,871. Nevertheless, the Williams Act is clearly not designed as armament for incumbent management, *Rondeau v. Mosinee Paper Co., supra*, 422 U.S. at 58–59, 95 S.Ct. 2069; *Piper v. Chris-Craft, supra*, and more than a technical violation of 13(d) requirements must be shown. *Universal Container Corp. v. Horwitz*, [1977–78] C.C.H.Fed.Sec.L.Rep. ¶ 96,161 (S.D.N.Y.1977) (Conner, J.); *Scott v. Multi-Amp Corp., supra*. While the issue is a close one, the omissions here seem more technical than substantive. Although the statement does not say that Sun was planning a 100% takeover, it does indicate that that was one of the options under consideration. Also it sets forth the power that

Sun's holding affords to block mergers or amendments to BD's articles of incorporation. Sun's statement thus sufficiently complied with Section 13(d) requirements.

### Sun's Sale from Dickinson and Turner

[45] Plaintiffs urge that Sun's purchase from Dickinson and Turner on terms different from those agreed upon with other solicitees violated Section 10(b) of the Exchange Act and Rule 10b–13, 17 C.F.R. § 240.10b–13, promulgated thereunder. Among other things, Rule 10b–13 is designed to prevent large shareholders from using their power to exact advantages which other shareholders could not obtain and to prevent tender offerors from changing the terms of the offer and giving late tenderors a higher price. The Commission's purpose in promulgating Rule 10b–13 was " 'to safeguard the interests of the persons who have tendered their securities pursuant to the stated terms of a tender offer' by prohibiting the offeror from making any 'outside' purchases on different terms during the offer's duration." *Heine v. Signal Companies, Inc.*, [1976–77] CCH Fed.Sec.L. Rep. ¶ 95,898 (S.D.N.Y.1977) (Frankel, J.). Further, "the rule has wider application than merely to situations involving competing offers for control," and applies to tender offers even where a trading market has not developed. *Warren v. Bokum Resources Corp.*, 433 F.Supp. 1360, 1365–66 (D.N.M.1977). Turner and Dickinson were allowed to take a part of the payment for their shares in cash and in installments over an 8 year period at 8% interest. No other solicitee was given the same opportunity.

Except to the extent indicated above, Sun has no present plans or proposals with respect to a merger or liquidation of the Company, the sale or transfer of a material amount of the assets of the Company, any change in the Company's Board of Directors or management or any other material change in the Company's business or corporate structure.

The Shares referred to in Item 5 hereof constitute approximately 34.1% of the Shares reported by the Company to be outstanding at September 30, 1977. As the owners of approximately 34.1% of the outstanding Shares, Sun and the Subsidiary may account for their interest in the Company the "equity method." Un-

der New Jersey law and the Company's Restated Certificate of Incorporation, mergers and certain other business combinations by the Company, as well as amendments to the Company's Restated Certificate of Incorporation, require the affirmative vote of the holders of 66⅔% of the outstanding Shares. In addition, under the Company's By-laws, any holder of more than 25% of the outstanding Shares may call a special meeting of the Company's stockholders, although a majority of the outstanding Shares entitled to vote is required to constitute a quorum at a meeting of the Company's stockholders.

The deferred payment to Dickinson and Turner was a tax benefit to them which was not offered to Willock, Smith and Drake for example. This arrangement appears to be a definite infraction of Section 10(b) of the Exchange Act, Rule 10b–13 promulgated thereunder.

*Sections 17(d) and 17(e) of the Investment Company Act of 1940, 15 U.S.C. §§ 80a–17(d) and 17(e) and Rules 17d–1, 17 C.F.R. § 270.17d–1*

Plaintiffs contend that Eberstadt violated both Sections 17(d) and 17(e) of the Investment Company Act and Rule 17d–1, 17 C.F.R. § 270.17d–1 promulgated thereunder and that Zeller and M & D aided and abetted that violation. That statute resulted from a 4 year study of the investment company industry by the Commission. Based on the Commission's recommendations and ·conclusions, the Act "was designed primarily to correct the abuses of self-dealing which had produced injury to stockholders of investment companies," and Section 17 was "aimed specifically at insuring the independence of management and its fidelity to stockholders." *United States v. Deutsch,* 451 F.2d 98, 108 (2d Cir. 1971), *cert. denied,* 404 U.S. 1019, 92 S.Ct. 682, 30 L.Ed.2d 667 (1972).

Section 17(d) prohibits an affiliated person acting as a principal from effecting any transaction in which the registered investment company is a joint or several participant in contravention of Commission rules. Section 17(e) provides that it shall be unlawful for an affiliated person acting as an agent to accept compensation for the purchase or sale of any property to or for the registered company.

Eberstadt is 75% owner of M & D which acts as manager and adviser to Chemical and Surveyor Funds, registered investment companies. Eberstadt is surely an affiliated person in respect of the funds within the meaning of Sections 17(d) and 17(e). Zeller's efforts have been detailed and need not be repeated. It is sufficient to say that the funds were joint and several participants in the Sun transaction. *See S.E.C. v.*

*Talley Industries, Inc.,* 399 F.2d 396, 402–03 (2d Cir. 1968), *cert. denied,* 393 U.S. 1015, 89 S.Ct. 615, 21 L.Ed.2d 560 (1969). Zeller involved the funds in this transaction from the outset. In *United States v. Deutsch, supra,* the Court of Appeals defined the phrase "acting as agent" in Section 17(e) to comprise all the activities of an affiliated person when "he is not acting as a broker for the investment company." 451 F.2d at 111. Thus, Eberstadt was acting as the funds' agent in the Sun transaction.

 Under a designated formula, Eberstadt reimbursed both funds for a portion of the fee it received as compensation for the transaction. However, that appears to be insufficient. A violation of Section 17(e) is complete when the affiliated person receives the compensation. It is not necessary to establish that the compensation had any influence on conduct. The Act is designed to proscribe the appearance of or conflicts of interest. *See United States v. Deutsch, supra,* 451 F.2d at 110. That that standard remains applicable has been more recently reaffirmed in *United States v. Blitz,* 533 F.2d 1329, 1345 (2d Cir. 1976). Eberstadt was required by the Investment Company Act and the rules ·promulgated thereunder to seek and obtain permission from the Commission before involving the funds in this transaction and before accepting compensation from Sun for its activities on Sun's behalf. Under the standards already discussed, Zeller and M & D qualify as aiders and abettors of Eberstadt's violation of the Investment Company Act. Again, reliance on advice of counsel does not excuse· the violations, but it goes solely to the remedy.

*Plaintiffs' Remaining Contentions*

Plaintiffs assert ·that Dickinson violated Section 10(b) of the Exchange Act, Section 14(e) of the Williams Act, Rule 10b–5, and his fiduciary obligations to BD shareholders. The argument appears to be that Dickinson transgressed those provisions by violating Section 13(d), by failing to advise BD management that he was shopping around for a purchaser for his holdings, and by

accepting a premium for his shares from Sun without allowing the other BD shareholders to participate. There is no merit in any of the contentions. It is true that Dickinson did not advise management that he was trying to use his stock to engender a takeover effort. He certainly was aware of the corporate resolution of June 22, 1977, indicating BD's desire to remain independent. Dickinson, however, had been stripped of all effectiveness within the organization by the time he sold his stock to Sun, had been terminated as an employee of the company and had not been placed on the company slate for reelection as a director. There is no record of his attending any board meetings after June, 1977. The only connection the record shows between Dickinson and BD subsequent to September is the settlement discussions concerning purchase of his stock by BD which apparently continued into December.

Even though still a director, he was under no duty to follow management blindly. He did not feel that the current management was acting in the shareholders' best interest. Nor was he under a duty to reveal his plans to management. His silence becomes actionable only if there was a duty to speak, *see Rochez Bros., Inc. v. Rhoades, supra,* 527 F.2d at 889; *Brennan v. Midwestern United Life Ins. Co.,* 417 F.2d 147, 154 (7th Cir. 1969), and there was no such duty owed to management. Dickinson's efforts to promote a takeover by a third party were not per se violative of any fiduciary obligations. Again, one is reminded that the Williams Act and the federal securities laws in general are not designed to favor management in takeover attempts or to prevent takeovers. *Piper v. Chris-Craft, supra.* While it has been determined that Dickinson violated Section 13(d) and Sun violated Section 14(d), there is nothing on this record to support a finding that Dickinson's attempt to effectuate a takeover of BD was adverse to the shareholders' interest. In addition, he used no insider information in his dealings with Sun that came from his position as director. *See S.E.C. v. Texas Gulf Sulphur Co.,* 401 F.2d 833, 848 (2d Cir. 1968) (en banc), *cert. de-*

*nied,* 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969).

Although Dickinson did not advise other shareholders that he was receiving a premium for his shares, no Section 10(b) liability is created by that omission. *Haberman v. Murchison,* 331 F.Supp. 180 (S.D.N.Y.1971) (Gurfein, J.), *aff'd,* 468 F.2d 1305 (2d Cir. 1972). A stockholder has no duty to other stockholders to refuse a premium or to advise them that he is receiving a premium. The fact that Dickinson participated in a transaction which favored only himself, some of his shareholder friends, and various institutional shareholders does not constitute a breach of any statutory or common law obligation Dickinson owed BD shareholders. *See Haberman v. Murchison, supra; Clagett v. Hutchison,* 583 F.2d 1259 (4th Cir. 1978); *Christophides v. Porco,* 289 F.Supp. 403 (S.D.N.Y.1968) (Pollack, J.). The aiding and abetting claims, of course, fail as well.

*Rule 390 of NYSE*

This rule provides that no member shall effect a transaction off the exchange either as principal or agent. Both Eberstadt and Salomon are members of the NYSE and bound by the rule. Defendants argue, of course, that they did not effect any transaction, since Eberstadt and Salomon claim to have acted solely as financial advisors. That question need not be reached since plaintiffs' cause must fail in any event. There is certainly support for the view that a private right of action lies against a member of NYSE for violations of some rules of NYSE. *See e. g. Rolf v. Blyth Eastman Dillon & Co.,* 424 F.Supp. 1021 (S.D.N.Y.1977) (Pierce, J.), *aff'd,* 570 F.2d 38 (2d Cir.), *cert. denied,* 439 U.S. 1039, 99 S.Ct. 642, 58 L.Ed.2d 698 (1978) (Rule 405). The rules under which such an implied right of action is implied are those which are for the benefit of the investor. Whether a breach of an NYSE rule creates civil liability depends on the "nature of the particular rule and its place in the regulatory scheme." *Colonial Realty Corp. v.*

*Bache & Co.*, 358 F.2d 178, 182 (2d Cir. 1966). Rule 390 regulates the activities of members, but whether a transaction is or is not effectuated on the floor of the exchange does not appear to be of great significance to most investors. Therefore Rule 390 seems designed more as an NYSE housekeeping measure than as an instrument for providing special benefit to investors. Accordingly, there is no basis for implying a right of action by class plaintiffs for infraction of that rule.

### New Jersey Corporation Takeover Bid Disclosure Statute

This issue has received very little attention by either the court or counsel during the trial and in the various submissions. The impact of the New Jersey law has been presented here as a peripheral, not central question. BD has sought to have New Jersey authorities take action against defendants but thus far they have failed to do so. Defendants argue that the statute is unconstitutional and that view has powerful support. *See Leroy v. Great Western Corp.*, —— U.S. ——, ——, 99 S.Ct. 2710, 61 L.Ed.2d 464 (1979) (dissenting opinion). Whether the Williams Act has left room for state legislation in the corporate takeover field or what effect New Jersey law has on this acquisition are matters that require considerably more study and attention than either has received in this case. Under the circumstances, abstention seems the appropriate course for the court to take. *See Railroad Comm'n of Texas v. Pullman Co.*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941); *NAACP v. Bennett*, 360 U.S. 471, 79 S.Ct. 1192, 3 L.Ed.2d 1375 (1959).

### Defendants' Affirmative Defenses

Defendants argue that BD management's effort to bring pressure on the Commission through federal and state elected officials to take action in this case, and its use of a media campaign to damage defendants' public image was unwarranted. As a consequence, they suggest that BD should be barred from pursuing its claim under the doctrine of unclean hands. While it is certainly true that BD has expended considerable energy in attempting to press public officials into service against defendants, there has been no showing of any unlawful activity on their part. Since the rationale for our institutions is democratic, every citizen has a constitutional right to pressure the government into action to redress actual or supposed grievances. The evidence does not show that BD has done more than that. Defendants' claim is simply unsupported and is dismissed.

Defendants also urge the court to dismiss the Commission's case for a variety of reasons. They argue: (1) that the Commission, in violation of its own rules, refused to allow a submission by defendants' counsel before initiating this proceeding; (2) that a Commission attorney sought to force Lipper to submit to an interview in the absence of counsel; (3) that the Commission attempted to examine the defendants' file and take papers therefrom without first advising defendants' lawyer; (4) that the Commission succumbed to political pressure in instituting the proceeding; and (5) that it unlawfully refused on grounds of executive privilege to provide certain evidence to defendants.

All of these issues were raised prior to trial and are discussed in *Wellman v. Dickinson*, 79 F.R.D. 341 (S.D.N.Y.1978). While serious doubt was expressed in that opinion that the drastic relief of dismissal would be appropriate, it was decided that the proper approach was to postpone final decision until after trial. Now that the defendants have been allowed full opportunity to show the nature of the Commission's alleged improprieties, the court is certain that the relief defendants seek is unwarranted. None of the cases on which the defendants relied for support are applicable, and there is no need to review in this overlong opinion what was said in the prior case. Reference is made to that opinion, and the court now holds that the tentative conclusions announced therein, to the effect that defendants' defenses lacked merit, are now firm and final.

Since *Wellman*, the Court of Appeals has decided *United States v. Fields*, 592 F.2d

638 (2d Cir. 1978). In that case a defendant, realizing that he was in violation of the federal securities laws, met with the Commission and agreed to civil liability with the hope and expectation that the matter would not be referred to the United States Attorney for criminal prosecution. Commission employees misled the defendants into believing that no such reference would be made, even though they had already made the referral. Defendant was prosecuted and a motion to strike some counts in the indictment was granted because of the Commission's egregious conduct. On appeal, the court reversed, holding that striking counts of the indictment was not warranted. It said: "We believe on the facts of this case that the district court, in opting for the most drastic remedy available to it, abused its discretion. The relief granted was wholly out of proportion to the wrong sought to be corrected." *Id.* at 647.

The improprieties in *Fields* are far greater than here. Moreover, the facts alleged herein are in dispute. The Commission denies that its employees sought to have Lipper talk to them without counsel, and in any event he did not do so. Defendants do not appear to have been prejudiced by any of the alleged misconduct. Thus, there is no basis for barring the enforcement action. Finally, on the question of unlawful reliance on executive privilege, that issue should have been raised, as were many others, in the pre-trial proceedings. It is too late in the day to raise new arguments regarding discovery. The affirmative defenses are thus without merit, and they are accordingly rejected.

*Conclusion*

In sum, Sun is liable for violation of Section 14(d) of the Williams Act for making a tender offer without the required pre-acquisition filing. Dickinson, Eberstadt, M & D and others violated Section 13(d) by failing to file the necessary statement indicating the formation of a group involved in the transfer of corporate control. Zeller, Lipper, Salomon, and Eberstadt aided and abetted Sun's violation and Zeller, Lipper and Salomon aided and abetted the 13(d) group violation. Eberstadt also violated the Investment Company Act and Zeller and M & D abetted this violation as well. Sun violated Section 10(b) of the Exchange Act and Rule 10b–13 by buying from Dickinson and Turner on terms different from those offered the other solicitees. The defendants' affirmative defenses are without merit and do not warrant relieving them of liability. On the other hand, Sun substantially complied with the filing requirements of 13(d) and Dickinson did not violate Sections 10(b), 14(e), Rule 10b–5 or his fiduciary duties. No private right of action can be implied under Rule 390 of the NYSE, so no relief will be obtained here for violation of that rule. Finally, I will abstain from decision regarding alleged violations of New Jersey law, because the relevant issues have not been fully addressed.

The agreement among counsel and the court was that this phase of the litigation would concern liability only. Both the Commission and defendants, however, have expressed a desire to deviate from that agreement at least to some extent. The Commission desires an injunction to enjoin future violations. Defendants argue that the individual and class plaintiffs have established no injury and for that reason their claims should be dismissed. Under the arrangements agreed upon, plaintiffs properly concentrated on issues of liability and made no attempt at making a showing of injury except on a generalized basis. The court sees no need to deviate from our understanding. The agreement, as the court understands it, means that the parties have bound themselves to maintain the status quo except with prior consent of the court until the issues involved are finally and fully determined. There is, therefore, no need to grant the Commission's request. As for defendants' argument, unless plaintiffs succeed in showing injury and the extent to which they have suffered hurt, they, obviously, will not establish entitlement to relief—which is the next phase of this proceeding.

Settle Order.